**UNITED STATES of America, Appellant,**

v.

**Gene Allen HERROLD.**

**No. 91–5781.**

United States Court of Appeals, Third Circuit.

Argued April 10, 1992.

Decided May 6, 1992.

Rehearing and Rehearing In Banc Denied June 2, 1992.

---

**12.** *See, e.g.,* Brief for Appellee at 28–29; Reply Brief for Appellant at 7 n. 5, 16.

James J. West, U.S. Atty., George J. Rocktashel (argued), Asst. U.S. Atty., Lewisburg, Pa., for appellant.

James V. Wade, Federal Public Defender, D. Toni Byrd (argued), Harrisburg, Pa., for appellee.

Before GREENBERG, SCIRICA, and ROSENN, Circuit Judges.

OPINION OF THE COURT
GREENBERG, Circuit Judge.

## I. PROCEDURAL HISTORY AND FACTS

### A. PROCEDURAL HISTORY:

This matter is before the court on an appeal by the government from an order entered by the United States District Court for the Middle District of Pennsylvania denying reconsideration of its previous order suppressing evidence. The procedural history and the essentially undisputed historical facts are as follows. The defendant-appellee, Gene Allen Herrold, a previously convicted felon, was indicted on April 9, 1991, for possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(e), and for using and carrying a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1). On May 28, 1991, Herrold filed a motion to suppress evidence in the district court which, on June 26, 1991, conducted an evidentiary hearing on the motion. On July 3, 1991, the court filed an order and opinion granting the motion. The court concluded that, although the police had probable cause to arrest Herrold, there was no exigent circumstance to permit them to enter his trailer home without a warrant as they originally had done. Accordingly, even though the police within hours of their original entry searched the trailer under the authority of a search warrant, the court held that a gun, cocaine, and cocaine paraphernalia discovered in Herrold's trailer in plain view during the warrantless entry were inadmissible.

On July 8, 1991, the government moved for reconsideration of the order of July 3, 1991, on the ground that, without regard to the illegal entry, the officers would have inevitably discovered the evidence when executing the search warrant. The government further asserted that there was an independent basis for the warrant without regard to the discoveries made during the warrantless entry. The court denied the government's motion for reconsideration on August 22, 1991, holding that the "inevitable discovery" doctrine did not apply.

The government has filed a timely appeal from the August 22 order and we have jurisdiction under 18 U.S.C. § 3731.

### B. FACTS:

The case may be said to have originated on August 22, 1990, when a confidential informant met with Herrold to arrange a cocaine purchase. Herrold told the informant that he had recently obtained a large quantity of cocaine and could make the sale. The informant relayed this information to the Region IV Narcotics Strike Force based in State College, Pennsylvania, which developed a plan to survey the drug transaction and arrest Herrold.

Later that day, the informant met with Herrold and paid him $300.00 towards the purchase. The informant and Herrold agreed to complete the sale on August 24. On that day the informant called Herrold to make final arrangements, telling him to bring the drugs to the informant's home in Selinsgrove, Pennsylvania, so that they would complete the sale there.

The surveillance team, comprised of Trooper Hill, Detective Gerringer, Sergeant Berthelson, Sergeant Garlock and Chief Ramer, met between 5:00 and 5:30 p.m. Hill then went to the informant's house where he strip-searched him, and, in a further effort to ensure that any drugs which the informant might produce were obtained from Herrold, Gerringer and Berthelson searched the informant's vehicle. The searches did not uncover any drugs. In accordance with their plan, Garlock and Ramer, who were in constant radio communication with Hill and Berthelson, sat in a police vehicle at an assigned location near the informant's home.

When the informant called Herrold, Herrold's girlfriend, Barbara Crowther, came to the phone and indicated that she and Herrold would go to the informant's home shortly. The informant relayed this information to Hill, who decided to change the location of the purchase to Herrold's trailer. Accordingly, the informant called Herrold again and asked another woman who answered the phone to inform Herrold that

he would come to Herrold's trailer. Hill then notified the other members of the surveillance team of the change in plans and of the new location.

At around 8:09 p.m., the informant arrived at Herrold's trailer. The surveillance team then observed Herrold leave the trailer and enter the informant's car, which the informant, followed by Hill, drove away. But in a very short time, the informant drove back to the trailer. Herrold then left the vehicle and re-entered his trailer alone.

The informant then drove to Hill's surveillance location and gave his purchase to Hill who determined in a field test that it was positive for cocaine. The informant advised the surveillance team that he had paid Herrold $650.00 for the drugs, and also informed the officers that Herrold planned to go out to a bar that evening. He also stated that Herrold had been smoking crack-cocaine earlier that evening and was "squirrely." The informant had earlier advised the police that Herrold had a gun.

Although the surveillance team had originally intended to obtain a search warrant prior to searching Herrold's trailer, the district court found that they decided to arrest Herrold in his trailer without first doing so based on the following facts:

(a) Herrold had more cocaine and was going to go to a bar; (b) The officers knew, based on discussions with [the informant] that Herrold would very likely take cocaine with him out of the house to the bar for sale to other persons; (c) Because of the trailer's proximity to neighboring residences, the officers were concerned that they would not be able to maintain an effective surveillance on the residence for the approximately three or four hours they thought it would take to obtain a search warrant or arrest warrant, without being detected, Herrold alerted, and the evidence destroyed.... The officers also knew that Herrold had previously been convicted of two violent felonies involving weapons, specifically armed robberies.... [The informant] had also advised the officers that Her-

rold was "squirrely" and that caution should be exercised in dealing with him. App. at 156–57.

Accordingly, Hill approached Herrold's trailer as the other officers surrounded it. Hill then knocked on the door, and, when Herrold answered, Hill recognized Herrold as the man who sold the drugs to the informant. Hill asked him if he was "Gene Herrold" and Herrold responded that he was not. Hill then asked if Herrold knew where to locate Gene Herrold and Herrold responded that he did not. At that point, Hill informed Herrold that he was a state trooper and that he was under arrest.

Herrold yelled out an obscenity and attempted to slam the door, but Hill forced it open and entered Herrold's trailer. Herrold fled down the hallway with an object in his hand. Hill then yelled in a loud voice for Herrold to surrender. Eventually Herrold moved towards the table in the living room, placed the object on the table, and lay on the floor, submitting to arrest. The object was a .25 caliber Raven Arms semi-automatic pistol, loaded with four live rounds.

Hill secured the pistol and Herrold, and then secured the rest of Herrold's home with the assistance of the other officers. Though the officers observed drug paraphernalia and cocaine in plain view, they did not then search the trailer. Rather, Hill left with another officer to obtain a search warrant from a district justice while other surveillance team members remained at Herrold's residence to ensure that the evidence was not destroyed.

In his application for a warrant, Hill swore to the following facts with respect to the events that occurred before he entered the trailer:

On 08–24–90, at approx. 1940 hrs.... Officer [Hill] searched a Confidential Informant (C.I.) and found C.I. to be free of any controlled substances. The vehicle to be operated by C.I. was also searched by ... Raymond GE[R]RINGER and Sgt. Jay BERTHELSON, Mahoning Twp P.D., the vehicle was also free of controlled substances. C.I. was then followed to the residence of Gene A.

HERROLD. C.I. parked at the residence, HERROLD was observed exiting the mobile home and walking towards C.I. C.I. & HERROLD then drove in C.I.'s vehicle a short distance West on T-404 (Sholley Rd.) HERROLD then sold the C.I. a quantity of cocaine. Both subjects then immediately returned to the mobile home where HERROLD was dropped off by the C.I. HERROLD entered the residence while C.I. met with your affiant and turned over the cocaine purchased from HERROLD.

This officer performed a field test using the Modified Scott Reagent and noted a positive reaction to the presence of cocaine. During this period surveillance was maintained on HERROLD's residence by Sgt. T. GARLOCK, SUNBURY, p.d., Chief RAMER, Riverside P.D. and Det. GERRINGER. No other persons were observed entering or leaving the HERROLD residence.

The transaction between HERROLD & C.I. OCCURRED between 2008 and 2009 hrs.

App. at 53–54.

In addition, the affidavit set forth the events that took place following Hill's forced entry into Herrold's residence:

At 2040 hrs. this officer approached the front door of the trailer and knocked on same. Gene A. HERROLD answered the door with his left hand hidden. This Officer asked if he was Gene HERROLD. HERROLD denied his identity. This officer then identified himself and advised HERROLD he was under arrest. HERROLD immediately slammed the door on this officer's hand and attempted to keep the door shut while screaming 'Get the fuck out of here.' This officer was able to pull the door open. Upon gaining control of the door from HERROLD, subject fled into the living room area. While he was fleeing this officer observed an unidentified object in his hand. HERROLD was ordered numerous times to halt but failed to do so.

HERROLD broke out the window above the air conditioner in the living room in an attempt to escape however he was deterred by officers covering the rear of the mobile home. HERROLD was then observed by this officer placing the unidentified object in his hand on the table in the living room. Subject then finally laid down and submitted to arrest. Found on the table in the living room in plain view was a .25 Cal. Semi–Automatic Raven Arms pistol fully loaded.

Observed in plain view in the rear bedroom on a dresser at the foot of the bed was a plate with a white powdery substance on same cut into two 'lines'. The substance appeared to be approximately ¼–½ ounce of cocaine.

App. at 54.

The district justice to whom the application was made issued a warrant at around 11:45 p.m. to search Herrold's trailer, and at 12:50 a.m., on August 25, the officers conducted a complete search of Herrold's trailer. During this search, they recovered the cocaine and drug paraphernalia observed during their original entry and recovered additional cocaine and drug paraphernalia. It is not clear whether the gun was seized during this search because the record does not indicate its location between the time of Hill's original entry and the execution of the search warrant. Furthermore, an inventory after the execution of the warrant recited that the gun was "seized on arrest in plain view," thus suggesting that the gun was seized during the officers' initial entry.[1]

Following his indictment Herrold moved to suppress the evidence discovered in his trailer during the original entry and the search. At the hearing on the matter, the government argued that Herrold had "waived his expectation of privacy" when he answered the door, and further asserted that exigent circumstances justified the warrantless entry. On July 3, 1991, the district court rejected these arguments, and held that there had been a warrantless

---

1. Actually we can hardly conceive that the officers left the gun on the table while Hill sought the warrant.

search and seizure which violated Herrold's Fourth Amendment rights. Thus, the court suppressed the evidence found in plain view at the time of the warrantless entry.[2] The court, however, did not suppress the evidence seized during the second search as it stated that "Hill may have obtained a valid warrant after arresting Herrold and securing his residence."

On July 8, 1991, the government moved for reconsideration on the ground that the "inevitable discovery" doctrine, as it believed was set forth in *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988),[3] justified the admission of evidence discovered in Herrold's trailer during both searches. The government argued that, even assuming the warrantless entry into Herrold's trailer violated his Fourth Amendment rights,[4] the subsequent entry did not because the officers had probable cause to obtain the search warrant for Herrold's trailer *regardless* of the incriminating information they originally discovered during the forcible entry. Accordingly, the officers would inevitably have discovered the gun and the drugs pursuant to a validly issued warrant.

The district court denied the government's motion for reconsideration on August 22, 1991, holding that the application for the search warrant was "tainted" by the information obtained in the unlawful first entry, and thus the subsequent search was invalid. In the district court's view, "[t]he Government has not met its burden of proving by a preponderance of the evidence that the evidence discovered during the illegal, warrantless entry into Herrold's home in violation of the Fourth Amendment would inevitably have been discovered by an independent, lawful police investigation." Though we think that it would have been logical from these findings for the court to have suppressed the evidence discovered and seized in the warranted search, the order entered simply denied the

motion for reconsideration. Thus, it appears that while the intent of the district court was to suppress all of the evidence obtained during either entry, the order by its terms only suppressed evidence seized or observed during the original entry. The government has appealed from the order of August 22, 1991.

## II. STANDARD OF REVIEW

■ Generally, the denial of a motion for reconsideration is reviewed for an abuse of discretion. *Koshatka v. Philadelphia Newspapers, Inc.*, 762 F.2d 329, 333 (3d Cir.1985). However, because an appeal from a denial of a motion to reconsider necessarily raises the underlying judgment for review, the standard of review varies with the nature of the underlying judgment. Where, as here, the underlying judgment was based in part upon the interpretation and application of a legal precept, our review is plenary. *Id. See also Huff v. Metropolitan Life Insurance Co.*, 675 F.2d 119, 122–23 n. 5 (6th Cir.1982). But to the extent that the district court's order was based on its factual conclusions, we review under a "clearly erroneous" standard. *Ram Construction Co. v. American States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir.1984).

## III. DISCUSSION

### A. FRAMEWORK OF THIS DISPUTE:

■ While ultimately we conclude that the search warrant was valid, a determination that essentially governs our result, it is nevertheless appropriate to review the rules regarding warrantless searches, as the police did not have a warrant for their original entry. We start with the recognition that the Fourth Amendment protects an individual's reasonable expectation of privacy from unauthorized government intrusion. *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576

---

**2.** There is no indication in the record that the officer seized anything during the original entry except for the gun. The order, however, also suppressed the cocaine and cocaine paraphernalia which was in plain view.

**3.** As we discuss later, *Murray* is an independent source case, not an inevitable discovery case.

**4.** *See Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

(1967) (Harlan, J., concurring). On this appeal, however, the government has not contested Herrold's assertion that he had a reasonable expectation of privacy in his trailer home.[5]

■ Where an individual possesses a reasonable expectation of privacy in a given area, typically the government must obtain a warrant prior to searching that area. As the Supreme Court has stated,

> searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.

*Horton v. California,* 496 U.S. 128, 133 n. 4, 110 S.Ct. 2301, 2306 n. 4, 110 L.Ed.2d 112 (1990) (quoting *Katz v. United States,* 389 U.S. at 357, 88 S.Ct. at 514).

Thus, in this case if the government had to rely on the warrantless entry to uphold the search and seizure it would have the burden of demonstrating that the search and seizure were permissible under an exception to the Fourth Amendment's warrant requirement. *United States v. Morgan,* 743 F.2d 1158, 1162 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985); *Carter v. United States,* 729 F.2d 935, 940 (8th Cir.1984); *United States v. Kane,* 637 F.2d 974, 979 (3d Cir.1981). If the government could not make this showing, then the exclusionary rule would generally bar the admission of the illegally obtained evidence. *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

■ Inasmuch as the officers had neither a warrant for Herrold's arrest, nor a search warrant authorizing their initial entry into Herrold's trailer, Herrold naturally contends that evidence observed when the arrest and initial entry were made must be suppressed. While Herrold recognizes that the officers ultimately obtained a search warrant before entering his trailer for the second time, he builds on his contention, arguing that the second entry was similar-

ly unlawful and evidence discovered during the search is inadmissible as "fruit of the poisonous tree." This doctrine requires the exclusion of tangible evidence seized during an unlawful search, and derivative evidence, both tangible and testimonial, acquired as a result of the unlawful search. *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963); *Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984).

The issues before us are narrowed, for the government assumes for purposes of this appeal, as it did in the district court, that the initial entry violated Herrold's Fourth Amendment rights. Thus, if the validity of the search and seizure was dependent on the legality of that entry, the evidence would have to be suppressed. However, the government contends that the "inevitable discovery" doctrine applies and that there was a valid basis independent of the original entry for the search warrant. Therefore, in its view the exclusionary rule does not require suppression of evidence discovered during either the original entry or the later search because the evidence inevitably would have been discovered under the valid warrant.

While the record is not absolutely clear as to what happened to the contraband between the time of the original entry and the execution of the warrant, we believe that except for the gun the evidence observed during the first entry was seized during the second search. Furthermore, we will treat the district court's order as suppressing all the evidence seized in both entries, as we are satisfied that this was the court's intent.

**B. TAINTED WARRANTS:**

■ Although Herrold's "fruit of the poisonous tree" argument has superficial appeal in view of the original wrongful entry, it is flawed for the reasons set forth in *United States v. Johnson,* 690 F.2d 60

---

5. Despite the government's concession, *California v. Carney,* 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), indicates that the privacy interest in a trailer home is not equivalent to the privacy interest in a non-mobile home.

(3d Cir.1982), *cert. denied*, 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 450 (1983). There, the government appealed from a district court order suppressing evidence discovered pursuant to a search warrant which had been issued partly on the basis of an affidavit which included information about evidence seized during an unlawful search. We held that, "even assuming that some factual averments in the affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit." *Id.* at 63. We then determined that the affidavit contained other information establishing probable cause and therefore that the warrant had been properly issued.[6]

We are not alone in taking what we view as a sensible approach. *See, e.g., United States v. Vasey*, 834 F.2d 782, 788 (9th Cir.1987) ("[t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant.... A reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant."); *United States v. Driver*, 776 F.2d 807, 812 (9th Cir.1985) ("[A] warrant may be upheld even where it contains tainted and untainted facts as long as the untainted portions contain a sufficient showing of probable cause to render the warrant valid."); *United States v. Mankani*, 738 F.2d 538, 545 (2d Cir.1984) (once it is established that material in the affidavit must be disregarded as a basis for the issuance of a warrant, the court must separate and set aside such material and determine if remaining facts demonstrate probable cause); *United States v. Gigli*, 573 F.Supp. 1408, 1413 (W.D.Pa.1983) (same). Indeed, in a slightly different context involving allegedly false statements in an application for a search warrant, the Supreme Court placed its imprimatur on this principle. Thus, in *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978), the Court stated, "if,

when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause," the warrant will be deemed to have been properly issued.

These cases certainly appear to provide the appropriate framework within which to decide this appeal so that we need merely excise the references to the first entry and the fruits thereof in examining the affidavit upon which the warrant was based to determine if there was probable cause for the warrant. Thus, except perhaps for the gun, this cannot be regarded as a warrantless search case at all. But Herrold argues that this case presents a special question not adequately focused upon by those decisions. He urges that the government conducted two searches and must therefore rely on the "inevitable discovery" doctrine to justify the admission of the evidence. In Herrold's view, it is improper for a reviewing court to excise information in a warrant application obtained through unlawful means to evaluate whether the police *would have* discovered the incriminating information lawfully. Since the government itself invokes the inevitable discovery doctrine and thus has argued the case as Herrold has presented it, we will examine that doctrine to determine if it is actually implicated here.

**C. EXCLUSIONARY RULE EXCEPTIONS:**

**1. Inevitable Discovery:**

■ *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), is the leading case on the inevitable discovery doctrine. There, the police questioned the defendant concerning the whereabouts of a murder victim outside the presence of counsel in violation of the Sixth Amendment. The defendant agreed to direct the officers to the victim's body and did so. At trial, the defendant urged that evidence

---

**6.** The primary issue in *Johnson*, whether the warrant authorized a general search, is not involved here.

concerning the location and existence of the body could not be admitted against him because it was a fruit of the Sixth Amendment violation. The prosecution argued that, although the police had violated the defendant's right to counsel, evidence that they had discovered the body could be admissible because it inevitably would have been found by search groups who were "approaching the actual location of the body." *Id.* at 449, 104 S.Ct. at 2512.

The Supreme Court agreed with the prosecution. It held, "the derivative evidence analysis ensures that the prosecution is not put in a *worse* position simply because of some earlier police error or misconduct." *Id.* at 443, 104 S.Ct. at 2508. Moreover, "while the independent source exception would not justify admission of evidence in this case, its rationale is wholly consistent with and justifies our adoption of the ultimate or inevitable discovery exception to the exclusionary rule." *Id.* at 444, 104 S.Ct. at 2509. It concluded that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search—then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense." *Id.* at 444, 104 S.Ct. at 2509 (footnote omitted).

Here, however, since the evidence seen at the time of the original entry and the evidence later uncovered, except for the gun, was seized at the second search, there is no need to speculate as to whether the officers *would have* obtained a search warrant and whether they *would have* discovered the contraband for they did so. Hence, an inevitable discovery analysis is inappropriate.[7]

2. Independent Source:

We believe this case is better understood under the independent source doctrine, set forth in *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472, which the government relied on its brief on the motion to reconsider.[8] There, federal law enforcement agents illegally forced entry into a warehouse and observed burlap bags in plain view. These bags were later found to contain marijuana. The agents left the warehouse without disturbing the bags and obtained a search warrant for the warehouse. In applying for the warrant, the agents did not mention the prior entry, and did not rely on any observations made during that entry. The magistrate issued the warrant and the agents then conducted a second search of the warehouse and seized the burlap bags containing the contraband.

In assessing whether the evidence discovered during the second search could be admitted, a plurality of the Court turned to the independent source doctrine and examined its theoretical underpinnings as well as its relationship with the inevitable discovery doctrine. The Court noted that it had developed the independent source doctrine as a corollary to the exclusionary rule because:

'[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse* position, that they would have been in if no police error or misconduct had occurred.... When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.'

**7.** The court of appeals in *United States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 931 (1988), also relied on the inevitable discovery doctrine to justify the admission of evidence discovered pursuant to a search warrant although the officers had previously discovered that same evidence during an unlawful search. In the factual context before us, how-

ever, it seems that the independent source doctrine provides a better fit.

**8.** The independent source and inevitable discovery doctrine are closely related, *see Nix v. Williams*, 467 U.S. at 443, 104 S.Ct. at 2508, and thus it is not surprising that the government has conflated its references to them in its brief.

*Id.* at 537, 108 S.Ct. at 2533 (quoting *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984)) (emphasis in original).

The Court then observed that it had endorsed both a broad and a narrow conception of the "independent source" doctrine: under its broad conception, officers who unlawfully enter an area protected by the Fourth Amendment and learn of facts *x* and *y,* but then learn of fact *z* independently and lawfully, can have admitted into evidence their knowledge concerning fact *z* because it was obtained through a truly "independent source." *See Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). Under its specific definition, officers who unlawfully enter an area protected by the Fourth Amendment and learn of facts *x* and *y* but then later learn of facts *x* and *y* independently and lawfully, can have admitted into evidence their knowledge concerning facts *x* and *y.* Thus, citing Justice Holmes' remarks in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920), the Court held:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others.

*Murray,* 487 U.S. at 538, 108 S.Ct. at 2534.

▰ Accordingly, under the independent source doctrine, evidence that was *in fact* discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible. In contrast, the inevitable discovery doctrine, applied in *Nix,* permits the introduction of evidence that *inevitably would have* been discovered through lawful means, although the search that actually led to the discovery of the evidence was unlawful. The independent source and inevitable discovery doctrines thus differ in that the former focuses on what actually happened and the latter considers what

would have happened in the absence of the initial search.

Following the principles underlying the independent source doctrine, the Court in *Murray* determined that this doctrine might well justify the introduction of evidence discovered during the second search, holding:

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during their initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Id.* at 542, 108 S.Ct. at 2536.

Although the Court agreed with the court of appeals' determination that the warrant application contained sufficient probable cause apart from the information that had been unlawfully obtained, it remanded the case to the district court for that court to determine whether "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry...." *Id.* at 542, 108 S.Ct. at 2536.

### D. INDEPENDENT SOURCE BASED UPON PARTIALLY TAINTED WARRANT:

Because the evidence in this case, except for the gun which was seized on the initial entry and which we will consider later, was seized during the warranted search, this is an independent source case. Accordingly, we must determine if, without regard to information obtained during the original entry, the police would have applied for the search warrant and we must also determine if there was probable cause for the warrant to be issued. Resolution of these issues is not difficult. It is inconceivable that the police would have left the premises without searching the trailer and without arresting Herrold since they had information that Herrold, who was known to them

as a drug dealer with a record of convictions for violent crimes, had obtained a large quantity of cocaine some of which he sold to the informant. The clear inference from the facts known to the officers was that the remaining cocaine after the informant's modest purchase was in the trailer. In addition, the informant had advised them that Herrold had a gun. Furthermore, the evidence demonstrated that the police intended to obtain a warrant after the controlled buy but did not do so because Herrold was leaving the premises.

■ Accordingly, we are certain that if the police had not made their original warrantless entry, they would have arrested Herrold if he left the trailer, an act which Herrold concedes would have been lawful, and, in any event, would have sought the warrant to search the trailer. We therefore reject as clearly erroneous the conclusion by the district court that it was speculative as to whether the police would have obtained a warrant to search the trailer absent the original entry.[9]

Furthermore, it is obvious that the affidavit for the warrant contains sufficient probable cause apart from information the officers learned via the original entry. For example, it reflects that the surveillance team searched the confidential informant and his automobile and found them free of drugs. It notes that the surveillance team observed the informant purchase drugs from Herrold and saw Herrold enter his trailer home after the sale. It also states that Hill performed a field test on the drugs, which tested positive for the presence of cocaine. There is thus a clear inference that there was cocaine in the trailer.

■ The district court, relying principally on one sentence in the plurality's decision in *Murray*, suppressed the evidence. The district court observed that, under *Murray*, a warrant will not be deemed to have been validly executed "if the agents' decision to seek the warrant was prompted by what they had seen during their initial entry, *or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.*" App. at 13 (quoting *Murray*, 108 S.Ct. at 2536). The district court thus reasoned that, because the application for the warrant contained information discovered during the unlawful entry, this information necessarily "affected" the justice's decision to issue the warrant. In the district court's words, "[t]he affidavit upon which the search warrant was based clearly contains facts obtained and discovered as a result of the illegal, warrantless entry and arrest of Herrold in his home. Therefore, the evidence discovered during the initial warrantless arrest by Trooper Hill *affected* the production of the warrant." App. at 14 (emphasis supplied).

We do not agree with the approach of the district court because it conflicts with the policy underlying the independent source doctrine—namely, that the police not be placed in a worse position than they would have been in had they not engaged in illegal activity. To promote this interest, the Court's use of "affect" in *Murray* must be understood to signify affect in a *substantive* manner. Thus, the fact that an application for a warrant contains information obtained through an unlawful entry does not *per force* indicate that the improper information "affected" the justice's decision to issue the warrant and thereby vitiate the applicability of the independent source doctrine. Rather, if the application contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, providing that the officers were

9. We observe that the district court itself made findings which directly support our determination, and directly conflict with the court's own conclusion that it was "speculative" as to whether the police would have obtained a warrant in the absence of the first entry. For example, the court found that the police had originally intended to obtain a search warrant to search Herrold's trailer, but then changed their plans based on their belief that exigent circumstances existed in light of the possibility that Herrold would destroy the contraband. This finding clearly indicates that information discovered during the first entry did not "prompt" the police to obtain the warrant as they had intended to do so all along.

not prompted to obtain the warrant by what they observed during the initial entry.

Caselaw is in accord with this reading of *Murray*.[10] For example, in *United States v. Halliman*, 923 F.2d 873 (D.C.Cir.1991), a group of guests resided in various rooms in a hotel. A hotel housekeeper found drugs, drug paraphernalia, and ammunition in one of the guest's rooms. Accordingly, the night manager of the hotel phoned the police and informed them of the situation. The police proceeded to the hotel and conducted an investigation, during which hotel security and other personnel identified the occupants of the rooms at issue. The police obtained a search warrant to search certain rooms at the hotel that they believed the guests were using. After they had obtained the warrant, the hotel manager called the police and informed them that the guests had rented an additional room, but the police chose not to apply for a warrant for that room because it would delay their search.

Nevertheless, without a warrant authorizing them to do so, the police entered the additional room and searched it, discovering drugs and drug paraphernalia. The police asked the occupant if he would sign a consent to a search form and he refused. The police then applied for an emergency search warrant to search the newly-rented room in its entirety, noting in their application the events that had ensued in the prior search. The police arrested the occupant of the room on drug possession charges and the occupant filed a motion to suppress the physical evidence discovered in the room during both searches.

The Court of Appeals for the District of Columbia Circuit held that the officers were justified in entering the room under the exigent circumstances doctrine. However, in the court's view, that doctrine did not permit the police to search the entire room as they had essentially done during their first search. Nonetheless, the court found that the officers were permitted to search the room pursuant to the emergency warrant they had obtained. Significantly, quoting the district court, the court of appeals indicated that, "although the officers' warrant application stated that they had seized drugs from [the newly-rented room], 'under an objective standard, [that] information ... could not have affected the ... judge's decision to issue the emergency warrant.'" *Id.* at 880. In reaching its conclusion, the court held "[w]e agree with the district court's conclusion that 'there [were] overwhelming independent grounds to believe that [the newly-rented room] contained narcotics.'" *Id.* Hence, the independent source doctrine permitted the police to introduce into evidence the drugs and drug paraphernalia discovered in the additional room.

Similarly, in *United States v. Gillenwaters*, 890 F.2d 679 (4th Cir.1989), the court of appeals held that the district court had properly excised information that had been unlawfully obtained in determining whether probable cause still existed to justify the issuance of the warrant and whether independent source doctrine applied. In the court's view, this approach "comports with the Supreme Court's admonition that, 'while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied.'" *Id.* at 682 (quoting *Murray v. United States*, 487 U.S. at 542, 108 S.Ct. at 2535). *Accord, United States v. Salas*, 879 F.2d 530, 537 (9th Cir.) (independent source doctrine applied where warrant would have been issued even if information that had been unlawfully obtained was not provided in warrant affidavit), *cert. denied*, 493 U.S. 979, 110 S.Ct. 507, 107 L.Ed.2d 509 (1989); *United States v. Whitehorn*, 829 F.2d 1225 (2d Cir.1987) (probable cause supported issuance of warrant without reference to information obtained through unlawful search; hence, inevitable discovery doctrine justified admission of evidence),[11] *cert. de-*

---

**10.** While we did not characterize *United States v. Johnson*, 690 F.2d 60, which was a pre-*Murray* case, as involving the independent source doctrine, in fact it did.

**11.** Here, as in *United States v. Whitehorn*, 813 F.2d 646, the court relied on the inevitable discovery doctrine when it appears that the independent source doctrine was appropriate.

*nied,* 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988); *United States v. Silvestri,* 787 F.2d 736, 746 (1st Cir.1986) (independent source doctrine permits the admission of evidence gained through an unlawful search as well as a subsequent search pursuant to a valid warrant, so long as the lawful search was truly "independent"), *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988).

■ Hence, we are satisfied that the district court focused on the wrong question when it held "[t]he Government has not presented any evidence proving by a preponderance of the evidence that the Magistrate's decision to grant the search warrant was entirely independent of the information discovered during the illegal warrantless entry." The government was not required to make such a showing which probably could have been made only by producing the justice as a witness so that he could be asked to reconstruct his state of mind when he issued the warrant. Rather, the government was required to establish that a *neutral* justice would have issued a warrant based on the untainted information in the affidavit which the police had acquired prior to their entry into Herrold's trailer. Likewise, the district court's observation that "whether the Government would have followed through on its averred intention to seek a search warrant before entering Herrold's home is speculative," in addition to being clearly erroneous, misses the mark. The critical question in this regard is whether the first search prompted the officers to obtain a

warrant, not whether the police were already in the process of obtaining a warrant.[12] Here it is clear that the police were motivated by circumstances independent of their initial observations in the trailer to seek the warrant.

■ We recognize, of course, that this case presents a special question with regard to the gun because the police actually seized it during the unlawful entry and not during the warranted search. Nevertheless, we see no reason not to treat the gun as also being seized pursuant to the search warrant which specifically authorized the seizure of "firearms of any type." The Supreme Court in *Murray* rejected the argument that objects "once seized cannot be cleanly reseized without returning the objects to private control," 487 U.S. at 541–42, 108 S.Ct. at 2535 (quoting *United States v. Silvestri,* 787 F.2d at 739), and stated that under the independent source doctrine "reseizure of tangible evidence already seized" is permissible "[s]o long as the later, lawful seizure is genuinely independent of an earlier tainted one." *Id.* It would be dangerous to require officers to leave a fully-loaded, semi-automatic weapon unsecured until they obtained a warrant, and senseless to require the formality of physically re-seizing the gun already seized during the initial entry. Thus, the only logical implication under *Murray* is that the gun is as admissible under the independent source doctrine as the other, non-dangerous evidence, seen during the initial entry but not seized until the warrant-authorized search.[13]

---

12. In this vein, the court's reliance on *United States v. Satterfield,* 743 F.2d 827 (11th Cir. 1984), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985), in its determination that the "legal" search must have been underway at the time of the illegal search to support an application of the inevitable discovery doctrine, illustrates its error in making its analysis on the basis of the inevitable discovery doctrine. The court of appeals decided *Satterfield* before *Murray,* and its timing requirement was based on its view that "a valid search warrant nearly always can be obtained after the search has occurred, [and] a contrary holding would practically destroy the requirement that a warrant for the search of a home be obtained *before* the search takes place." *Id.* at 846 (emphasis in original). However, the court's concern with timing is

unfounded in an *independent source* context because, under *Murray,* the police may not rely on information acquired during an illegal search to obtain a warrant; they must have additional information demonstrating probable cause, and this information must have been acquired in a lawful manner. Further, the reviewing court must conclude that the unlawful search did not prompt the lawful search.

13. Writing only for himself, Judge Greenberg would additionally hold that, even viewing the gun as seized only during the warrantless entry, it is admissible under the "inevitable discovery" doctrine. He points out that, if the police had not entered Herrold's trailer without a warrant, which they did based on their good-faith belief

In sum, the district court should have asked two questions: (1) whether a neutral justice would have issued the search warrant even if not presented with information that had been obtained during an unlawful search and (2) whether the first search prompted the officers to obtain the search warrant. If the answers to these questions are yes and no respectively, which they are in this case, then the evidence seized during the warranted search, even if already discovered in the original entry, is admissible. Otherwise the police would indeed be in a worse position than they would have been in had they not violated Herrold's Fourth Amendment rights.

Importantly, our result, which harmonizes the tainted warrant and independent source doctrines, will not provide the police with an incentive to avoid the warrant requirement. Rather, by its very nature it is only applicable where the police have in fact obtained a warrant. In addition, it will not give the police incentive to search first without a warrant, because any information discovered in an unlawful search is useless to the police in a subsequent warrant application. Moreover, our result is dependent upon our conclusion that the police would have obtained the warrant even if Hill had not made his original entry.

## IV. CONCLUSION

In view of the aforesaid we will reverse the order of August 22, 1991, denying the government's motion for reconsideration and will remand the matter to the district court for trial. None of the evidence obtained in either the original entry or the warranted search will be suppressed on the basis of the exclusionary rule.

in the existence of exigent circumstances, they would inevitably have sought and, given the existence of probable cause, obtained a warrant and would have thus recovered the gun in the trailer. He notes that the district court expressly found that the officers intended to obtain a warrant before searching the trailer but did not do so only after learning that Herrold intended to go out for the evening. Judge Greenberg also underscores that, even if Herrold had left with the gun before the officers obtained the warrant, the officers at the scene would have then arrested Herrold in public and searched his person at that time.