UNITED STATES of America,

v.

John F. "Duffy" CONLEY, William C. Curtin, Sheila F. Smith, John Francis "Jack" Conley, Thomas "Bud" McGrath, Mark A. Abbott, Thomas Rossi, William Steinhart, Roberta Fleagle, Robin Spratt, Monica C. Kail, William J. Reed, Joanne T. Smith, Kenneth "Ron" Goodwin, Lawrence N. "Neudy" Demino, Sr., Christopher "Chris" Kail, Joseph A. Devita, Frank Garofalo, Thomas D. Ciocco, Michael Sukaly, Phillip M. "Mike" Ferrell, Anestos "Naz" Rodites, and William E. Rusin, Defendants.

Cr. No. 91–178.

United States District Court,
W.D. Pennsylvania.

June 30, 1994.

Frederick W. Thieman, U.S. Atty., W.D. Pa., James R. Wilson, Asst. U.S. Atty., W.D. Pa., and William D. Braun, Cr. Div., U.S. Dept. of Justice, Washington, DC, for plaintiff.

James Wymard, William Difenderfer, Anthony Mariani, Ellen Viakley, Gary Gerson, Caroline M. Roberto, Joel Johnston, Stanley Greenfield, Martha Bailor, Ray Radokovich, Carmen Martucci, Lee Markovitz, Edward J. Osterman, William Acker, Foster Stewart, Joseph Kanfoush, Carl Max Janavitz, Raymond M. Maloney, John Goodrich, Gary B. Zimmerman, Vincent Baginski, John Zagari, and James Andring, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court is Defendant John F. "Duffy" Conley's Motion to Suppress Evidence (Document No. 832). In prior proceedings, the Court suppressed evidence of statements made by John F. "Duffy" Conley ("Duffy Conley") on October 30, 1989. The Court concluded that, under the applicable law, the statements were unconstitutionally coerced statements in violation of the Fifth Amendment. *United States v. Conley*, 856 F.Supp. 1010 (W.D.Pa.1994) (Document No. 800). The Court also issued a Memorandum Opinion and Order denying the Government's Motion for Reconsideration of Order Suppressing Statement. (Document No. 919). In the motion presently before the Court, Duffy Conley seeks to suppress all the Government's evidence because, in summary, the evidence of gambling activities gathered by federal officials after Duffy Conley's October 30, 1989 statement is tainted by the statement in that the statement motivated and was the cause of the subsequent investigation into gambling activities.

### *Findings of Fact*

1. On July 20, 1989, the late Honorable Gerald J. Weber, United States District Judge for the Western District of Pennsylvania, granted partial summary judgment in favor of the Government in an *in rem* civil forfeiture action brought against a variety of video poker machines. *United States v. 294 Various Gambling Devices*, 718 F.Supp. 1236 (W.D.Pa.1989).

2. Notwithstanding the Pennsylvania Supreme Court decision in *Commonwealth v. Two Elec. Poker Game Mach.*, 502 Pa. 186, 465 A.2d 973 (1983), which held that video poker machines are not *per se* illegal if they are not actually equipped with knock-off switches and meters, Judge Weber held that "all ... video poker machines with knock off switches and meters, *or the provision* in wiring, circuitry or programming to accommodate the addition of knock off switches and meters" are *per se* illegal under federal law. *294 Various Gambling Devices*, 718 F.Supp. at 1246 (emphasis in original).

3. In August, September and October, 1989, Federal state and local authorities held a series of a half-dozen or so meetings to address Judge Weber's opinion, which the authorities viewed as creating new enforcement opportunities in the video poker machine gambling area.

4. One of those meetings occurred in the United States Attorney's Office, then occupied by Acting United States Attorney Charles Sheehy. Mr. Sheehy, First Assistant U.S. Attorney Craig McKay, Former FBI Supervising Agent Robert Garrity ("Garrity"), FBI Special Agent Charles Duffy ("S.A. Duffy"), FBI Special Agent John Donnelly ("S.A. Donnelly") and Pennsylvania State Troopers Cunningham and Aaronson were present. (N.T. April 4, 1994, at 116).

5. The meeting was called to introduce the members of the law enforcement groups to each other and to the Acting United States Attorney's plan to implement Judge Weber's decision. (N.T. April 4, 1994, at 116–17).

6. Targets of the joint task force were identified by name. (N.T. April 4, 1994, at 117). Duffy Conley, Three Rivers Coin, his company, and several of his associates were targeted for prosecution at this meeting. Also targeted were Haubelt Vending and the Arnold Coin Company. (N.T. April 4, 1994, at 117–19).

7. As a result of the early meetings, where federal, state and local officials shared information on video poker gambling operations conducted the City of Pittsburgh and surrounding areas, federal officials, including Garrity, S.A. Duffy and S.A. Donnelly, concluded that Duffy Conley was involved in the largest video poker machine gambling operation in the Pittsburgh area.

8. Though the FBI agents were convinced that Duffy Conley was involved in the largest video poler machine gambling operations, they did not know the exact parameters of his involvement.

9. The FBI had reason to believe that Duffy Conley and his company were under the direction of Ninny Lagatutta, a suspected member associate of organized crime. (N.T. April 14, 1994, at 11). The FBI had reason to believe that Ninny Lagatutta had a hidden interest in Haubelt Vending Co.

10. In a related investigation being conducted out of an already opened FBI RICO case file (the "RICO file"), S.A. Donnelly was investigating an individual named Sonny Ciancutti. Sonny Ciancutti was believed to have a hidden interest in Arnold Coin Company.

11. From the records of Arnold Coin, S.A. Donnelly had identified Duffy Conley as a potential informant and/or defendant in the RICO case. As a member of the joint task force on video poker gambling, S.A. Donnelly was also aware that Duffy Conley and his company had been targeted by the task force in its early meetings.

12. In mid-October of 1989, S.A. Donnelly paid a visit to Duffy Conley at Duffy Conley's Windgap Avenue Warehouse. (*See* Document Nos. 800 & 919).

13. S.A. Donnelly was surprised at the relatively cooperative attitude displayed by Duffy Conley. S.A. Donnelly was excited and informally reported the conversation to his supervising agent, Garrity, on the day of or day after the Windgap encounter. (N.T. April 14, 1994, at 25–29). S.A. Donnelly did so notwithstanding his promise to Duffy Conley that they could speak "off the record" and his assurance to Duffy Conley that he was not a target of investigation.

14. S.A. Donnelly went to the Main Hotel on Monday, October 30, 1989 in an effort to re-contact Duffy Conley, which he did. Duffy Conley's statements that day are the statements which have been suppressed by the Court and from which the "taint" to the federal investigation is alleged to have arisen.

15. At the Main Hotel, S.A. Donnelly learned, *inter alia*, that Duffy Conley had been indicted on state gambling charges and was to have a preliminary hearing on those charges on Friday, November 3, 1989 at a magistrate's office in the Brookline section of the City of Pittsburgh. Duffy Conley admitted to S.A. Donnelly that the machines upon which S.A. Donnelly had seen the bartender make a pay-off were his and that he was going to continue in the video poker gam-

bling business irrespective of its legality under federal law.

16. S.A. Donnelly left the Main Hotel at the conclusion of his encounter with Duffy Conley. He returned to his office in Downtown Pittsburgh and embodied some of the substance of his encounter with Duffy Conley in a written FD–302 report. He also initiated a records check of Duffy Conley.

17. S.A. Donnelly also orally reported parts of what he included in the FD–302 to Garrity, his supervisor, specifically that Duffy Conley admitted that the machines at the Main Hotel were his and he intended to remain in the video poker machine gambling business even though it was illegal.

18. S.A. Donnelly wrote his FD–302 in longhand and submitted it to the stenographer's pool to be typed on October 30, 1989. After it was returned to him from the stenographer's pool for revision, it was typed in final form on November 3, 1989. The FD–302 was written to and ultimately incorporated in the RICO file.

19. Although a supervising agent may review FD–302's that are generated in the course of investigations, Garrity did not read S.A. Donnelly's FD–302 on or about November 3, 1989.

20. On the morning of November 3, 1989, S.A. Duffy and S.A. Donnelly arrived at the magistrate's office in Brookline to attend Duffy Conley's state-court preliminary hearing on November 3, 1989. While S.A. Duffy was in the courtroom, S.A. Donnelly had a brief conversation with Duffy Conley's attorney and Duffy Conley regarding the events at the Main Hotel four days before. The preliminary hearing was continued to another date.

21. While at the magistrate's office, S.A. Donnelly and S.A. Duffy discussed with each other some of the substance of Duffy Conley's statements of October 30, 1989, including Duffy Conley's stated intention to continue in the video poker gambling business notwithstanding federal law.

22. Upon leaving the magistrate's office, S.A. Donnelly returned to his office in Downtown Pittsburgh. When he told Garrity of his conversation with Duffy Conley's attorney, Garrity instructed him to write a memorandum to "the file" regarding the conversation, which S.A. Donnelly did. On November 8, 1989, the stenographer's pool typed the final version of the memorandum, and the memorandum was placed in the Illegal Gambling Business file that was opened on November 3, 1989.

23. At the same meeting between Garrity and S.A. Donnelly, Garrity instructed S.A. Donnelly to open an Illegal Gambling Business file (the "IGB file") naming as its subjects Ninny Lagatutta, Duffy Conley, William Curtin and other unknown individuals, as well as Haubelt Vending and Three Rivers Coin.

24. S.A. Donnelly prepared the opening memorandum. In the memorandum, S.A. Donnelly stated that intelligence sharing between federal, state and local officials indicated there was a large scale video poker machine gambling operation in the Western District of Pennsylvania, Duffy Conley and William Curtin had been indicted on state gambling charges, and it was the opinion of several investigative agencies that Duffy Conley's operation was substantially larger than previously believed.

25. On November 3, 1989, Garrity opened the IGB file by signing off on the opening memorandum prepared by S.A. Donnelly. Garrity assigned the IGB file to S.A. Duffy, and indicated that S.A. Donnelly was to work the file jointly with S.A. Duffy.

26. Garrity knew some of the substance of Duffy Conley's statements of October 30, 1989, specifically that Duffy Conley admitted the machines at the Main Hotel were his and intended to continue in the video poker machine gambling business. He considered these admissions significant and useful evidence.

27. Garrity also knew of the exchange among S.A. Donnelly, Duffy Conley and Duffy Conley's attorney, which occurred because S.A. Donnelly learned at the Main Hotel of Duffy Conley's state-court indictment and preliminary hearing.

28. Garrity's decision to open the IGB file was not based upon the information recited

in the preceding two paragraphs; rather, the decision to investigate Duffy Conley was motivated by the renewed federal interest in gambling resulting from Judge Weber's decision and the information sharing among federal, state and local law enforcement personnel.[1]

29. In the ensuing weeks, as the agents worked the IGB file, S.A. Duffy read the FD–302.

30. Beginning about December 1, 1989, the federal authorities began preparing an affidavit of probable cause for search and seizure warrants as part of the IGB investigation. S.A. Donnelly was the affiant on the document when it was submitted to a federal magistrate.

31. S.A. Donnelly prepared the portion of the affidavit that related Duffy Conley's statements at the Main Hotel. A copy of S.A. Donnelly's FD–302 was placed in the IGB file when it was used in the preparation of the affidavit of probable cause. The FD–302 was discussed among various FBI agents and Assistant U.S. Attorneys in relation to the affidavit's preparation.

32. Numerous warrants were issued on the basis of the affidavit, and at a number of the locations raided, video poker machines belonging to Duffy Conley were seized and searched. Among the locations raided was the Main Hotel.

33. Although the record evidence is scant, the Main Hotel was included in the affidavit for reasons other than Duffy Conley's statements there to S.A. Donnelly. In fact, S.A. Donnelly was aware of Duffy Conley's ownership of the video poker machines at the Main Hotel prior to his encounter with Duffy Conley.

34. The IGB file opened in the aftermath of Judge Weber's decision developed into several investigations, which were severed from the root IGB file as the facts warranted. The September 20, 1991 Indictment in this case can be traced back to the November 3, 1989 IGB file.

35. Except as explicitly detailed above, the Government developed no information or investigatory lead from Duffy Conley's statements at the Main Hotel on October 30, 1989.

### Discussion

■ Because the Court suppressed Duffy Conley's statements on the basis that they were involuntary, coerced statements, see *Conley*, 856 F.Supp. at 1020 (Document No. 800) *and Conley*, 856 F.Supp. at 1018–1019 (Document No. 919), the Court must determine what part of the Government's case, in addition to the coerced statements themselves, is "fruit of the poisonous tree." *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); *United States v. North*, 920 F.2d 940, 946 n. 7 (D.C.Cir. 1990); *United States v. Kurzer*, 534 F.2d 511, 516 n. 8 (2d Cir.1976). The inquiry is an application of the exclusionary rule, rather than an application of the rule barring the use of immunized testimony against a person granted immunity. *See North*, 920 F.2d at 946 n. 7; *Kurzer*, 534 F.2d at 516 n. 8; *see also Bram v. United States*, 168 U.S. 532, 548, 18 S.Ct. 183, 189, 42 L.Ed. 568 (1897).

■ The exclusionary rule requires the suppression at trial of evidence obtained directly or indirectly through government violations of a defendant's constitutional rights. By the rule's formulation, it can be seen that evidence first obtained from a truly independent source is not excluded by the rule. *See Murray v. United States*, 487 U.S. 533, 537, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988); *United States v. Herrold*, 962 F.2d 1131, 1139 (3d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992). Likewise, information learned first from an illegal source is not forever shielded from view, if it was in fact later obtained from a truly independent source. *Murray*, 487 U.S. at 538, 108 S.Ct. at 2533; *Herrold*, 962 F.2d at 1140. Part of the burden of proving an independent source is showing that the decision to seek evidence was not influenced by the evidence

---

**1.** The Government entered several newspaper articles and editorials that appeared in the Pittsburgh Press. The editorials criticized the U.S. Attorney's failure to have taken action in the wake of Judge Weber's decision. The government, however, failed to make any connection between the news items and the decision to investigate Duffy Conley.

flowing from the unconstitutional conduct. *Murray,* 487 U.S. at 540, 108 S.Ct. at 2534.

■ Evidence is not necessarily suppressed under the exclusionary rule, however, even when it is causally related to the constitutional violation. When "evidence ... has been come by means sufficiently distinguishable to be purged of the primary taint," *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), it is not suppressed pursuant to the exclusionary rule. Even when the primary taint still inheres in the evidence, it still may be admitted into evidence at trial provided the government can prove that the evidence would have been discovered by lawful means had it not been discovered first through unlawful means in that the government was actively and independently pursuing a line of investigation that most likely would have lead to the discovery of the evidence. *See Nix v. Williams,* 467 U.S. 431, 445, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984); *Herrold,* 962 F.2d at 1138–39; *United States v. Cherry,* 759 F.2d 1196, 1205–06 (5th Cir.1985).

■ Turning to the facts of the case before this Court, the Court concludes that the Government has demonstrated that the decision to pursue an Illegal Gambling Business investigation of Duffy Conley was independent of the statements made by Duffy Conley at the Main Hotel. In the aftermath of Judge Weber's decision, there was a renewed federal interest in video poker machine gambling. Long before Duffy Conley first met S.A. Donnelly, Duffy Conley had been identified in the meetings of the federal, state and local authorities as being involved in the largest video poker machine gambling operations. Against the backdrop of the clouds gathering over video poker machine gambling in the Western District of Pennsylvania, the Court found Former Supervising Agent Garrity to be credible when he stated that Duffy Conley's statements at the Main Hotel did not influence his decision to open the IGB file. Moreover, Duffy Conley had been identified as a primary target before he even met S.A. Donnelly, and the FBI investi-

gation of Duffy Conley was underway before the IGB file was opened.

■ Turning to specific information that was learned as a result of Duffy Conley's statements, the Court concludes that the exclusionary rule applies only to evidentiary use of the exchange among S.A. Donnelly, Duffy Conley and Duffy Conley's attorney at the magistrate's office in the Brookline section of Pittsburgh. S.A. Donnelly would not have been at the magistrate's office had he not unconstitutionally induced Duffy Conley to forego standing on his rights. The Government has not convinced the Court that its agents would have learned of Duffy Conley's preliminary hearing without the encounter at the Main Hotel. It has pointed to no truly independent source from which it learned of the hearing and no line of investigation that would have inevitably led its agents to Brookline on November 3, 1989. Given the subject matter of the conversation, the Court cannot conclude that the primary taint had been attenuated. To the extent that S.A. Duffy first saw Duffy Conley at the preliminary hearing, what Duffy Conley looks like would have been inevitably discovered.

■ S.A. Donnelly's running a records check on October 30, 1989 naming Duffy Conley, however, is a different matter. Given the intense interest in Duffy Conley shown by federal, state and local authorities in the aftermath of Judge Weber's decision, and the culmination of this interest in the formal opening of an investigative file on Duffy Conley, the records check, which was in fact prompted by Duffy Conley's statements, would have inevitably been undertaken. S.A. Donnelly testified that such checks were routine parts of investigations, and the investigation of Duffy Conley had begun, albeit not in its "formal" incarnation.

■ Given that the decision to investigate Duffy Conley came from a source causally independent of his suppressed statements, the incorporation of the substance of S.A. Donnelly's FD–302 into the affidavit of probable cause also invokes the independent source doctrine.[2] If the affidavit of probable

---

2. The Government has conceded that all reference to the suppressed statements must be strick- en from the affidavit of probable cause to search.

cause is purged of all reference to Duffy Conley's suppressed statements and is still found by the Court to contain adequate probable cause to seize and search Duffy Conley's video poker machines, the evidence so gathered comes from an independent source—the redacted affidavit. *Herrold*, 962 F.2d at 1140–44.[3] The Court will defer ruling on this aspect of Duffy Conley's motion until the time that it address the December 19, 1989 searches, which the Court will address in a separate opinion.

In all other respects, the Government's testimony unequivocally denies that Duffy Conley's statements at the Main Hotel were employed to further the investigation, and Duffy Conley has produced no countervailing evidence. The remainder of the Government's evidence is therefore from truly independent sources and outside of the scope of the exclusionary rule.

An appropriate order will be entered.

### ORDER OF COURT

AND NOW, this 30th day of June, 1994, upon consideration of the Court's Memorandum Opinion of even date, it is hereby ORDERED that Defendant John F. "Duffy" Conley's Motion to Suppress Evidence (Document No. 832) is GRANTED IN PART, DEFERRED IN PART, and DENIED IN PART AS FOLLOWS:

(1) The motion is GRANTED IN PART, and all evidence of the exchange between S.A. Donnelly, Duffy Conley and Duffy Conley's attorney on November 3, 1989 is suppressed, and all references to Duffy Conley's statements at the Main Hotel on October 30, 1989 are stricken from the affidavit of probable cause sworn to by S.A. Donnelly in December 1989;

(2) The motion is DEFERRED IN PART, until the Court rules upon the December 1989 applications for search warrants; and

(3) The motion is DENIED IN PART in that it is denied to the extent not expressly covered in ¶¶ 1–2 of this Order of Court.

---

**3.** The Court of Appeals for the Third Circuit has summarized the "taint" inquiry as it pertains to subsequent affidavits of probable cause:

In sum, the district court should have asked two questions: (1) whether a neutral justice would have issued the search warrant even if not presented with information that had been obtained during an unlawful search and (2) whether the first search prompted the officers to obtain the search warrant. If the answers to these questions are yes and no respectively, which they are in this case, then the evidence seized during the warranted search, even if already discovered in the original entry, is admissible. Otherwise the police would indeed be in a worse position than they would have been in had they not violated Herrold's Fourth Amendment rights.

*Herrold*, 962 F.2d at 1144.