**UNITED STATES of America,**
**Plaintiff,**

v.

**Jermaine HOWARD, Defendant.**

**No. CR.A. 01–92 GMS.**

United States District Court,
D. Delaware.

July 1, 2002.

Colm F. Connolly, United States Attorney, Marc I. Osborne, Assistant U.S. Attorney, Wilmington, DE, for plaintiff. ·

Christopher S. Koyste, Assistant Federal Public Defender, Wilmington, DE, for defendant.

## MEMORANDUM AND ORDER

SLEET, District Judge.

## I. INTRODUCTION

On May 1, 1999, the defendant, Jermaine Howard, was placed on probation

after being convicted of trafficking in cocaine in the Superior Court for the State of Delaware in February 1999.[1] As a condition of his probation, Howard was required to meet with his probation officer on a weekly basis. Additionally, due to the nature of his conviction, his driver's license was revoked. On November 7, 2001, Howard arrived for his weekly meeting with his probation officer. As Howard was leaving the meeting, his probation officer observed him approach a vehicle as if he was preparing to drive it. The officer stopped, detained, and searched Howard. The search of Howard's person revealed that although he was unemployed, he was carrying $361.00 in cash. After the money was seized, the officer asked Howard were he had gotten the money. Howard explained that his girlfriend had given him the money and why. The probation officer then called the girlfriend who allegedly stated that she had given Howard a different amount of money for a different purpose. The inconsistent explanations about the money led the probation officer to believe that Howard was again dealing drugs. He then searched the vehicle Howard had approached, which belonged to Howard's girlfriend. The search uncovered a firearm under the backseat. At that point, Howard was given the standard *Miranda* warnings, the City of Wilmington police were called, and he was taken into custody.

On December 11, 2001, the Grand Jury for the District of Delaware returned a one count indictment against Howard, charging him with possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1)

---

1. The Government's brief states that the term of probation began on May 1, 1999. The defendant's brief states that Howard's probation began in May 2001. Although the court notes the discrepancy, the court also notes that the discrepancy is immaterial because all parties agree that Howard was on probation at the time the events in question occurred. Therefore, the court will use the May 1, 1999 date for ease of discussion.

and 924(a)(2). On March 27, 2002, Howard filed an omnibus pretrial motion. Howard's motion asks the court to suppress physical evidence found by his probation officer in his on his· person, in his automobile, and in his residence. Howard also seeks to suppress inculpatory statements made after his arrest.

Howard argues that the physical and testimonial evidence must be suppressed because it was obtained as a result of an invalid *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Howard contends that the initial search was unjustified because his probation officer lacked reasonable suspicion to stop him. Moreover, Howard argues that the frisk was unjustified because it was not based upon a concern for the safety of officers or bystanders. Alternatively, Howard argues that the frisk violated the "plain feel" doctrine because (1) the lump in Howard's pocket was not immediately identifiable as currency or (2) it was not immediately apparent that it was contraband. Based on these alleged irregularities, Howard contends that the frisk was invalid and any evidence subsequently obtained should be suppressed as the "fruit of a poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Howard also argues that the search of the automobile cannot be justified under either the search incident to arrest or automobile exceptions to the warrant requirement. Howard contends there was no valid search incident to arrest because probable cause is necessary for an arrest. He maintains that there was no probable cause to arrest him. In the alternative, the defendant argues that the search exceeded the permissible scope of a search incident to arrest because he was not the occupant of the vehicle. Howard also argues that the automobile exception is inapplicable because ·there was no reasonable suspicion or probable cause to believe that contraband was present in the vehicle.

Finally, Howard argues that the statements he made must be suppressed because he did not validly waive his *Miranda* rights. Alternatively, Howard contends that the statements are the product of the initial seizure, and must be suppressed as the fruit of the poisonous tree.

The Government's initial response is that the evidence should not be suppressed because Howard, who did not own the car, lacks standing to contest the search. The Government further argues that the search incident to arrest and automobile exceptions are applicable because there was probable cause to arrest Howard for violating his probation or there was reasonable suspicion to believe that the car contained contraband. Finally, the Government argues that the defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights.

The court conducted an evidentiary hearing on the defendant's motions on April 30, 2002, and also heard oral argument during the hearing. Subsequent to the hearing, the parties briefed the issues raised in the suppression motion. After listening to the testimony at the evidentiary hearing and considering the arguments raised by counsel during oral argument and in their briefs, the court concludes that Howard has standing to contest the alleged Fourth Amendment violation. Additionally, the court concludes that while the initial *Terry* stop was justified by reasonable suspicion, the seizure of the money exceeded the permissible scope of a *Terry* frisk because the officers had no reason to suspect that the currency was a weapon or contraband at the time it was seized. As a result, the court finds that Howard's Fourth Amendment rights were violated. Moreover, the court finds that the initial

violation is clearly and closely connected with the search leading to the discovery of the handgun, which lead to the inculpatory statements by Howard. The court further concludes that there is no exception to the exclusionary rule that would render the physical or testimonial evidence admissible despite the Fourth Amendment violation. The court will therefore grant Howard's pretrial motion to suppress in its entirety.[2] The court will now explain the basis for its ruling.

## II. FINDINGS OF FACT

At the evidentiary hearing, the Government called three witnesses: Delaware Probation and Parole officers Todd Wiant and Robert Rowe, and City of Wilmington Police Officer James Ogden.[3] The defendant called one witness, Ms. Sheneka Warner. The following represents the court's essential findings of fact as required by Rule 12(e) of the Federal Rules of Criminal Procedure.

Jermaine Howard was placed on probation after being convicted and sentenced for trafficking in cocaine. Howard's case was assigned to state probation officer Todd Wiant. The conditions of Howard's probation dictated that he meet with Wiant on a weekly basis. Additionally, because his predicate offense was trafficking in cocaine, Howard's driver's license was revoked for a period of three years. *See* 21 DEL. CODE. ANN. § 4177K(b) (requiring rev-

ocation of driver's license for three years after conviction for trafficking in cocaine). Wiant testified that he was aware of the fact that Howard had been convicted of trafficking in cocaine and was also aware that Howard's driver's license was revoked as a result. Tr. at 6, 8.

On November 7, 2001, Howard arrived at Wiant's office at 5:00 p.m. for his regularly scheduled weekly appointment. Wiant testified that several months prior to this meeting, he had observed Howard behind the wheel of a car at a local shopping mall. Tr. at 7.[4] Additionally, just prior to the November 7 meeting, one of the local police departments informed Wiant that although Howard's license was revoked, he had been given a motor vehicle citation. Tr. at 8–9. In light of this information, Wiant reminded Howard that his driver's license was revoked. Howard stated that he believed he could legally drive. While Howard was in the office, Wiant called the Division of Motor Vehicles ("DMV") to confirm the status of Howard's license. Howard appeared to dispute the information provided by the DMV. Wiant again instructed Howard that his license was revoked and that he was not to drive. The meeting then came to a close.

As Howard was leaving the probation office, Wiant began to suspect that Howard might drive home. Tr. at 35. Wiant called his supervisor, Officer Rowe, and asked him to accompany him as he ob-

**2.** Howard's pretrial motion contains six separate requests, which are organized into six different roman numerals. Only points III, IV, and V raise suppression issues. During the suppression hearing, the parties indicated that point VI, which requests a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), is now moot. *See* Suppression Hrg. Tr. at 5. The court believes that given its resolution of the suppression issues, points I and II are also moot. However, if further proceedings are necessary in this

court, the court will give the defendant leave to refile as to points I and II if he desires.

**3.** Although Wiant is no longer employed at the Department of Probation and Parole, he was so employed when the relevant events occurred.

**4.** Wiant testified that he did not stop Howard at that time because Wiant's family was present, which created a safety issue.

served Howard. The two officers watched Howard approach a car. It was later discovered that the car was a 1994 blue Chevy Cavalier belonging to Howard's girlfriend, Shaneka Warner. Warner testified that she gave Howard's friends permission to drive the car, but not Howard. Tr. at 48.

Howard approached the driver's side of the vehicle. Wiant testified that he then placed the key into the door, but did not state that the door was opened. Tr. at 12. Rowe testified that Howard "opened" the door. Tr. at 62. However, Rowe's testimony did not convey whether "open" meant "unlocked" or whether it meant that the door was actually ajar. At any rate, there is no testimony that the door was ajar, or that Howard ever reached inside the vehicle. Additionally, neither officer testified that Howard had actually entered the vehicle. The court resolves the discrepancy by concluding that although Howard had unlocked the car door, there are no facts to indicate whether the door was open, and if so, how far it was open. The court further finds that regardless of whether the door was open, the testimony does not demonstrate that Howard entered, attempted to enter, or reached into the vehicle at any point.

After watching Howard approach the vehicle and place a key in the driver's side lock, Wiant and Rowe also noticed that there was no one else around who appeared to be heading toward the vehicle. All of these circumstances lead Wiant to believe that Howard would drive the car. At that point, Wiant yelled to Howard and told him to stop. Howard complied. Wiant estimated that this occurred at approx-imately 5:30 p.m. He testified that by that time, it was getting dark out and there were a number of people on the nearby street. Tr. at 12. Wiant then began to conduct a "pat-down" frisk of Howard. When asked why he felt the pat-down was necessary, Wiant testified, "It was evening time, it was dark out and a lot of people were roaming around the streets and I felt that I should shake him down before conducting any kind of a question-and-answer session with him." Tr. at 12.

During the pat-down, Wiant felt a lump in Howard's pocket. Wiant did not believe that the lump was a weapon. Rather, he testified that the lump "resembled bills being [sic] folded in half." Tr. at 13. Wiant testified that when he felt the lump, he "removed it from [Howard's] pocket and counted it in his presence." Tr. at 13–14. The count revealed that the "lump" was $361.00 in United States currency. Wiant knew that Howard was unemployed and had been unemployed for at least a year and a half. Wiant also knew that although Howard claimed that he had been receiving disability payments, he had not offered proof of his eligibility for those payments. Since Wiant knew that Howard had no steady, reliable source of income, Wiant and Rowe handcuffed him and placed him at the back of the car. Tr. at 63.[5]

After the money was removed from Howard's pocket, Wiant asked Howard where he had obtained it. Howard answered that his girlfriend, Shaneka Warner, had given him $250.00 in order to pay the bill at her child's day care service. Not entirely satisfied with this answer, Wiant asked Howard for Warner's telephone number. Wiant used a cell phone to

---

5. Wiant also testified that a probationer named Cody McIntyre provided some information about Howard's alleged criminal activities. Tr. at 31. However, the record does not clearly establish what information McIn-tyre might have provided. *Id.* Furthermore, Wiant testified that McIntyre's information had nothing to do with Howard's eventual arrest. Tr. at 34–35.

call Warner from the scene. He explained the situation, and asked her if she had given Howard any money and if so, for what purpose. Wiant testified that he did not remember Warner's answers, but that they did not comport with Howard's explanation. Warner testified that she did give Howard $250 for day care, and that she told Wiant this on November 7, 2001. Wiant later testified that although he could not say for certain that Warner told him that she gave Howard $250.00 for day care, he also could not say for certain that she did not. Tr. at 30. Howard provided no explanation for the origin of the remaining $111.00.

Wiant testified, "Once I found that his [Howard's] story was inconsistent, I did request [permission], through Officer Rowe, to conduct a search of the vehicle." Tr. at 28. When asked why he felt the search was necessary, Wiant stated, "[T]he reasons he [Howard] had the money weren't consistent with what she [Warner] told me and because he was unemployed for quite a long time and a known drug dealer convicted of drug dealing that [sic] I felt that was enough to prompt a search of the vehicle." Tr. at 30–31.[6] Rowe testified that "based on what we [had] seen so far," he authorized the search. Wiant also testified that at that point, he was not searching for weapons, but was searching solely for contraband. Tr. at 37.

Rowe also testified that the internal probation office procedures mandated that Wiant request permission from his superior officer before conducting a search. However, no other testimony on probation office methods or procedures for conducting searches was adduced during the hearing.

After Rowe granted authorization, Wiant and Rowe searched the vehicle. No warrant was obtained for the search, and neither Warner nor Howard consented to the search of the automobile. Rowe searched the trunk, but no evidence was found there. Wiant searched the front passenger area, where he found a live .38–caliber round in the glove compartment. He then continued his search, and found a handgun underneath the back seat. After the gun was found, Rowe read Howard the standard *Miranda* warnings and the Wilmington Police department was called.[7] Howard acknowledged that he understood his *Miranda* rights. Officer James Ogden of the Wilmington Police Department then arrived to take Howard into custody. Although Ogden did not testify as to his precise time of arrival, he stated that it was "early evening." Tr. at 77. Since the "early evening" comment is consistent with Wiant's statement that he stopped Howard at 5:30, the court concludes that Ogden arrived on the scene shortly after being called.

At the request of Wiant and Rowe, Ogden took Howard to his residence so that Howard could be present while the residence was searched. Although Ogden apparently did not question Howard, he began talking to Ogden and making inculpatory statements. Tr. at 78. At one point, he allegedly admitted that the gun was his. Tr. at 79. Ogden administered the *Miranda* warnings a second time. Howard acknowledged that he understood those warnings. *Id.* After being Mirandized, Howard told Ogden that the gun belonged to someone else, but that this person would harm Howard if he men-

---

**6.** Rowe testified that he could not recall whether Wiant provided this explanation, but the court will accept Wiant's version of events.

**7.** The defense stipulated to the fact that Rowe read the standard *Miranda* warnings. Tr. at 65.

tioned anything about it. Ogden and Howard eventually arrived at the residence. A search was conducted but noting related to the instant motion was seized. During the search, Howard apparently continued to make inculpatory statements. Tr. at 82.

After these events occurred, Howard was placed in state custody. He was subsequently indicted by a federal grand jury on December 11, 2001 for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

## III. DISCUSSION

The court will first address the Government's contention that Howard does not have standing to contest the search of the vehicle. The court will then discuss why it finds that the officers had reasonable suspicion to stop and frisk Howard. Next, the court will explain why the pat-down nevertheless exceeded the permissible limits of a *Terry* stop-and-frisk. The court will then discuss why the physical and testimonial evidence is the product of the previous violation and, therefore, the "fruit of a poisonous tree." Finally, the court will consider why no exception to the exclusionary rule can render the evidence admissible.

### A. Howard Has Standing to Contest the Search

■ The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." *See* U.S. Const. Amend. IV. An individual must have standing to assert a Fourth Amendment claim. *See Simmons v. United States*, 390 U.S. 377, 389–90, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Standing requires that the person challenging the al-

legedly illegal search or seizure "have a reasonable expectation of privacy in the property searched and that he manifest a subjective expectation of privacy in the property searched." *See United States v. Baker*, 221 F.3d 438, 442 (3d Cir.2000) (citing *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

■ Fourth Amendment rights are highly personal and cannot be vicariously asserted. *See id.* (citations omitted). Therefore, in order to have standing, an individual must prove that the allegedly unlawful search or seizure violated his or her own Fourth Amendment rights or expectation of privacy, as opposed to the Fourth Amendment rights of another. *See id.* Thus, a defendant would not have standing to contest the illegal search of a vehicle belonging to third party, even if the search of that vehicle produced incriminating evidence. *See id.* (citing *Rakas*, 439 U.S. at 134, 99 S.Ct. 421).

■ In the present case, the court concludes that Howard has standing to contest the search. In *United States v. Baker*, on somewhat analogous facts, the Third Circuit stated:

Baker is asserting his own, not a third party's expectation of privacy. He came alone in the car to the parole office. Although he did not own the car, he had substantial control over it insofar as he had borrowed it from a friend and had been driving it for four to six weeks. He carried the keys with him into the parole office

. . . .

We conclude that . . . there is clear evidence of continuing possession and control, as well as no evidence that the driver obtained the car illegitimately. Under the circumstances, therefore, Baker had the requisite legitimate expectation of privacy to support standing

for Fourth Amendment purposes. *Id.* at 443.

Similar to Baker, Howard was alone when he approached the car. Wiant testified that no other individual appeared to be heading toward the car at that time. Additionally, as in *Baker*, Howard carried the keys into the probation office with him. This inference is reasonable because he was observed retrieving the keys from his pocket shortly after he left his weekly appointment. The fact that Howard approached the car alone and had keys to the car establish his possession and control over the vehicle.

Finally, like the appellant in *Baker*, Howard had permission to use the vehicle. Warner testified that she allowed Howard to have access to the vehicle. Moreover, Warner allowed Howard to permit others to drive the car while it was in his possession. It seems reasonable to conclude from this fact that although Howard seemed reluctant to concede the limitations placed upon his ability to drive as a result of his license revocation, Warner recognized the need to have a properly licensed driver operate her vehicle. The court, therefore, finds that Howard's case is factually similar to *Baker*. In keeping with the *Baker* holding, the court concludes that Howard had a reasonable expectation of privacy in the vehicle.

The Government argues that Howard does not have standing because Warner gave him permission to be in the vehicle, but not to drive it. This issue did not arise in *Baker*, and neither the Third Circuit nor the Supreme Court have apparently addressed the question of whether a person who has permission to be in a vehicle but who does not have permission to drive the vehicle is entitled to a reasonable expecta-

tion of privacy under the Fourth Amendment. Nevertheless, the court will conclude that Howard has standing. The Government relies on and *United States v. Tropiano*, 50 F.3d 157, 161–62 (2d Cir. 1995) and *Baker*. *Tropiano* involved a stolen vehicle. Though the vehicle in *Baker* was not stolen, the Circuit commented on the issue of standing in this context.[8] The court agrees that a thief has no reasonable expectation of privacy in a stolen vehicle. However, the facts of this case are different. Although Howard may not have had permission to drive the car, the record clearly establishes that the car was not stolen and Howard possessed the car legally. There is a substantial difference between a person who exceeds their rights to a borrowed car and a person who steals a car. The borrower has some right to use the vehicle in a limited way whereas the thief does not and never will. Therefore, the court finds no guidance in the holdings of cases involving stolen vehicles or dicta directed to the hypothetical stolen vehicle.

The Government also cites *United States v. Boruff*, 909 F.2d 111 (5th Cir. 1990), in which the Fifth Circuit denied standing to a defendant who drove a rental car with the renter's permission, but with full knowledge that the rental contract forbid unauthorized drivers. *Boruff*, however, is distinguishable because the rental car scenario presents a different set of facts, circumstances, and considerations than those involved in the present case. Rental car companies require authorized drivers for business reasons. The companies have agreed to rent the car to a certain person. That renter's risk has been evaluated, and the rental company has agreed to rent the car to that renter

---

8. The Court of Appeals remarked, "[W]e have previously suggested that a defendant who had stolen a car and used it in a robbery would not have standing to object to a search of the car." *See Baker*, 221 F.3d at 442.

with those risks in mind. However, the rental car company has not evaluated the risk of any unauthorized drivers, and may, therefore, be unwilling to assume the risk associated with the activities of the unknown person.

By contrast, those same considerations do not seem to be implicated in Warner and Howard's relationship. It is possible that Warner had insurance concerns emanating from the fact that she may not have notified her carrier that Howard would be a regular operator of her vehicle. The fact that she permitted other unspecified persons to drive the car with Howard in it would seem, however, to suggest that this was not a paramount concern.

Further supporting this conclusion is the fact that rather than a financial relationship, Warner and Howard have not only a personal, but a romantic relationship. Thus, it is reasonable to conclude that Warner's principal motivation was to keep Howard from getting into trouble by prohibiting him from driving her car while he was unlicensed. Consequently, the court is persuaded that the reasoning in *Boruff* is not applicable to the facts of this case.

For all of the foregoing reasons, the court concludes that Howard had a reasonable expectation of privacy in the searched vehicle. Therefore, he has standing to object to the resultant search of the automobile.

### B. The *Terry* Stop

▆ Howard argues that the evidence against him was obtained through an invalid *Terry* stop. Again, the Fourth Amendment prohibits unreasonable searches and seizures. As a general matter, reasonable searches and seizures must be based upon probable cause and executed pursuant to a warrant. *See, e.g., Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). However, in *Terry v. Ohio,* the

Supreme Court held that brief, limited searches and seizures, known as "stops" or "frisks", can be undertaken if the officer has "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. 1868). Thus, reasonable suspicion, not probable cause, must be present for an investigatory stop to be valid. *See United States v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002).

### A. There was reasonable suspicion to stop Howard

Reasonable suspicion is a "somewhat abstract" concept. *See id.* at 751. There is no "finely tuned standard" of which facts or factors are sufficient to constitute reasonable suspicion. *See id.* (citations omitted). Indeed, the Supreme Court has "deliberately avoided reducing [the reasonable suspicion analysis] to a neat set of legal rules." *See id.* (citations and internal quotations omitted). The Court has, however, instructed that lower courts making reasonable suspicion determinations must "look at the totality of the circumstances of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *See id.*

▆ In the present case, the totality of the circumstances gave the officers reasonable suspicion to believe that Howard was about to drive a car. Given the fact that Howard's license was revoked, this would have been a traffic violation or a violation of the conditions of his probation. *See* 21 DEL. CODE. ANN. § 4177K(b). Wiant had previously observed Howard driving at a shopping mall. Wiant also knew that Howard had received traffic citations although his license was suspended. Additionally, on the evening of the arrest, Wi-

ant and Howard had called the DMV to verify that Howard's license was revoked. During the call, Howard appeared to dispute the status of his license. Howard's persistent belief that he could drive—even in the face of· evidence to the contrary— along with the other facts known to Wiant could reasonably lead him to conclude that Howard had been driving and might continue to do so. More important, after Howard left the probation office on November 7, Wiant and Rowe observed him heading toward the driver's side of a car. They saw him retrieve a key from his pocket and place the key in the driver's side door. Since Wiant and Rowe did not see anyone else heading toward the car and Howard was approaching the driver's side of the vehicle, it was reasonable to infer that Howard was about to. drive the car.

■ Howard argues that placing a key in a car is an innocent activity. After· all, he may have planned to open the car, sit down, and wait for the driver to arrive. As an initial matter, the court notes that even innocent activity can be considered in the reasonable suspicion analysis. *See Arvizu*, 122 S.Ct. at 751 (noting that although an act may be "innocent in itself," it may still form the basis for reasonable suspicion) (citing *Terry*, 392 U.S. at 22, 88 S.Ct. 1868). Moreover, Howard's innocence argument is severely undermined by Wiant's previous knowledge of Howard's unauthorized driving .activities. Additionally, at the time Wiant observed Howard, no one else was readily available to drive the vehicle and Howard did not offer this possibility as an explanation. All of these factors weigh against a finding that Howard's activities were merely innocent.

■ Howard also argues that he had not actually driven the car when Wiant and Rowe stopped him, thus precluding a finding of reasonable suspicion. This ar-gument must also fail. Law enforcement officers need not wait until a crime is consummated before reasonable suspicion can be found. *See Illinois v. Gates*, 462 U.S. 213, 245 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."). Therefore, the fact that Howard had not actually driven the car will not prevent the court from finding that there was reasonable suspicion to believe that he eventually would.

■ Finally, Howard contends that even if there were reasonable suspicion to stop him, the subsequent frisk was invalid because it was not justified by a concern for officer safety as required by *Terry*. *See Terry*, 392 U.S. at 27, 88 S.Ct. 1868. The court disagrees. Wiant testified that it was getting dark outside and there were many people on the street. Wiant testified that these factors directly motivated his pat-down of Howard. The court finds that the presence of passersby that could either harm the police or be harmed by an armed defendant, coupled with the darkness, would lead "a reasonably prudent man in the circumstances [to] be warranted in the belief that his safety or the safety of others was in danger." *See id.* Therefore, the court finds the frisk was justified by a concern for officer safety.

For these reasons, the court finds that under the totality of the circumstances, there was reasonable suspicion to stop and frisk Howard.

### B. The seizure of the money exceeded the permissible bounds of a *Terry* frisk

Although the initial frisk of Howard was justified by safety considerations, the subsequent seizure of the money in Howard's pocket exceeded the permissible scope of a

*Terry* frisk. The Supreme Court considered this issue in *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). In *Dickerson*, the police officer conducted a pat-down search of the defendant. *Id.* at 369, 113 S.Ct. 2130. The officer testified, "As I pat-searched the front of his body, I felt a lump ... in the front pocket. I examined it with my fingers and it slid and it felt to be a lump of crack cocaine in cellophane." *Id.* The defendant filed a motion to suppress, which was denied by the trial court. *Id.* at 370. The Minnesota Court of Appeals reversed, and the Minnesota Supreme Court affirmed the Court of Appeals decision. *Id.* However, neither court held that an officer could seize items that appeared to be contraband when touched. *Id.* at 370–71.

On appeal, the United States Supreme Court stated, "The question presented today is whether police officers may seize nonthreatening contraband detected during a protective pat-down search of the sort permitted by *Terry*." *Id.* at 373, 113 S.Ct. 2130. The Court held that such items could be seized, based on the "plain-feel" of an item, if its identity is apparent and "the officer has probable cause to believe the item is contraband before seizing it." *Id.* at 376, 113 S.Ct. 2130. Nevertheless, in applying the newly-created rule to the facts in *Dickerson*, the Court stated:

> Although the officer was lawfully in a position to feel the lump in the respondent's pocket, because *Terry* entitled him to place his hands upon the respondent's jacket, the court below deter-

mined that the incriminating nature of the object was not immediately apparent to him. Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by *Terry* or any other exception to the warrant requirement. Because this further search of the respondent's pocket was constitutionally invalid, the seizure of the cocaine that followed is likewise unconstitutional.

*Id.* at 379, 113 S.Ct. 2130.[9]

Turning to the present case, Howard argues that the lump in his pocket was not readily identifiable as currency, or that even if it was, the money was not immediately identifiable as contraband. The court finds that the lump was readily identifiable as money. Wiant testified that he felt a lump in Howard's pocket that felt like folded currency. He did not have to look at or examine the lump before making this determination. The court notes that a "wad" of currency has a very distinct feel and could have been recognized as currency by Wiant based upon its "plain feel."

Nevertheless, the court finds that the contraband nature of the currency was not immediately apparent. Indeed, unlike illegal drugs, certain weapons, or other such items, money is not *per se* contraband. A person can possess a substantial amount of cash for any number of lawful reasons. Although the incriminating nature of a sum of money may be immediately apparent if, for example, the underlying crime is bank robbery, *see, e.g., United States v. McWilliams*, Nos. 99–4128, 99–4129, 1999 WL 1020722 (4th Cir. Nov. 10, 1999), as a

9. Although the Third Circuit has not fully addressed the plain feel doctrine at this time, in discussing the analogous "plain view" doctrine, the Court of Appeals has consistently held that the incriminating nature of items in plain view must be immediately apparent. *See United States v. Menon*, 24 F.3d 550, 559 (3d Cir.1994) (noting that under the plain view doctrine, "the incriminating nature of the evidence must be immediately apparent."); *United States v. Benish*, 5 F.3d 20, 25 (3d Cir.1993) ("[A] plain view seizure is justified only if the 'incriminatory character' of the item sought to be seized is 'immediately apparent' at the moment preceding the seizure.")(internal quotes and citations omitted).

general proposition, it is legal to carry cash.

As noted, although the Third Circuit has not fully examined the "plain feel" doctrine at this time, two First Circuit cases further elucidate *Dickerson* and are relevant to the present case. In *United States v. Schiavo*, 29 F.3d 6 (1st Cir.1994), the defendant was stopped by an officer who asked him if he had a weapon. *Id.* at 7. After the defendant told the officer that he did not have a weapon, the officer saw a bulge. *Id.* at 8. The officer then conducted a pat-down search of the defendant. *Id.* The officer found a brown bag, and asked the defendant what it contained. He told the officer that it contained roughly $11,000. *Id.* The officer not only seized that money, which the officer knew was the product of an ongoing investigation, but also seized money in Schiavo's pockets. The First Circuit upheld the district court's suppression of the evidence because "the district court's conclusion that the incriminating nature of the bulge in Schiavo's pocket was not 'immediately apparent' was not clearly erroneous." *Id.* at 9.[10]

In *United States v. Chhien*, 266 F.3d 1 (1st Cir.2001), the defendant was frisked by an officer. *Id.* at 4. The officer asked the defendant what the lump was, and the defendant stated that it was $2,000 cash. *Id.* Without seizing the money, the officer then asked the defendant where he had obtained the money. *Id.* After further questioning of the defendant and his companion, both were arrested. In his suppression motion, Chhien attempted to suppress the fruits of the pat-down search, arguing that the officer knew the "lump" was not a weapon, and therefore should not have inquired about it. The First Circuit rejected this argument, stating, "While an officer may not *seize* an object during a *Terry* frisk unless he has probable cause to believe that it is contraband, he is not prohibited from inquiring, upon reasonable suspicion, into the nature of that object." *Id.* at 8 (emphasis in original) (citing *Dickerson*, 508 U.S. at 376, 113 S.Ct. 2130; and *Schiavo*, 29 F.3d at 9).

■■■■■ When *Dickerson*, *Schiavo*, and *Chhien* are examined together, two conclusions can be drawn. First, the incriminating nature of the object must be evident prior to the seizure of that object. *See Dickerson*, 508 U.S. at 379, 113 S.Ct. 2130; *Chhien*, 266 F.3d at 8; *Schiavo*, 29 F.3d at 9. Second, although an officer may inquire into the nature of an unknown object, such inquiry must occur prior to the seizure of the object. *See Dickerson*, 508 U.S. at 376, 113 S.Ct. 2130 ([There must be] "probable cause to believe the item is contraband *before* seizing it.") *Id.* at 376, 113 S.Ct. 2130 (emphasis added); *Chhien*, 266 F.3d at 8.

■■■■ In light of its interpretation of these three cases, the court finds that the seizure of the money in the present case exceeded the permissible scope of a *Terry* frisk for two reasons. First, Wiant did not indicate that he had any articulable facts— other than Howard's current employment status and recent conviction—that would justify a conclusion that the money had an illegitimate source.[11] Thus, the allegedly

---

**10.** For a more thorough discussion of the facts and rationale underlying the case, see the district court's opinion, reported at *United States v. Winter*, 826 F.Supp. 33 (D.Mass. 1993) (Winter was Schiavo's co-defendant.)

**11.** The court is not persuaded by the Government's argument that Howard's employment status and previous conviction, standing alone, were sufficient to make it immediately apparent that the cash was obtained through illegal means. It is not unreasonable to conclude that convicted persons can obtain money legitimately. Similarly, it is entirely possible for unemployed persons to acquire money

incriminating nature of the "lump" was not apparent, if at all, until after Wiant: (1) removed the currency from Howard's pocket, (2) counted it, (3) asked Howard where he had gotten it, (4) contacted Warner to verify Howard's version of the story, and (5) discovered that Howard and Warner's stories were allegedly inconsistent. Wiant's suspicions about the money were therefore not affirmed or verified at the time he seized it. Like the officers in *Dickerson* and *Schiavo*, Wiant had to take further steps to ascertain whether the money was contraband. The court thus concludes that the incriminating nature of the currency was not immediately apparent when the money was seized.

Second, the court finds that Wiant's seizure of the cash was premature. As noted in *Chhien*, "While an officer may not *seize* an object during a *Terry* frisk unless he has probable cause to believe that it is contraband, he is not prohibited from inquiring, upon reasonable suspicion, into the nature of that object." *Chhien*, 266 F.3d at 8 (emphasis in original). In the present case, as previously noted, Wiant did not have sufficient reason to suspect that the money might be contraband until he questioned both Howard and Warner. However, unlike *Chhien*, this inquiry did not take place prior to the seizure of the money. Wiant's testimony clearly establishes that he did not inquire as to the source of the funds until *after* the money had been removed and counted. Tr. at 13. Although it would have been proper for Wiant to remove the lump after his inquiry, under *Dickerson*, *Chhien*, and *Schiavo*, the failure to inquire as to the origin of the money prior to its seizure and removal was a violation of the "plain feel" doctrine. This is so because, without the inquiry, Wiant had no reason to suspect that the money was contraband. Without reason to suspect that the money was contraband, Wiant could not legally remove it.

For all of the foregoing reasons, the court concludes that the seizure of the money from Howard's pocket exceeded the scope of a lawful *Terry* frisk in violation of Howard's Fourth Amendment right to be free from unreasonable searches and seizures.

### C. The Physical and Testimonial Evidence Should Be Suppressed

#### 1. Both the physical and the testimonial evidence are the product of the initial *Terry* violation

██ Having determined that the money was seized in violation of the Fourth Amendment, the court must now decide whether the resulting evidence must be suppressed. In *Wong Sun v. United States*, the Supreme Court stated that "ev-

---

through lawful means. Accepting the Government's argument on this point would be tantamount to holding that unemployed persons with criminal records can never possess money without giving rise to reasonable suspicion of renewed criminal activity. The court is unwilling to stretch the Constitution in that manner.

Moreover, even if the court were persuaded that the prior conviction and the unemployment were relevant, three factors militate against a finding that those facts made the incriminating nature of the cash immediately apparent. First, although Wiant knew the "lump" was cash, he did not know how much cash was there until he removed and counted it. Second, the amount of money involved ($361.00) was relatively small. If Howard had possessed, say, $5,000 as opposed to $361.00, a finding of reasonable suspicion might be warranted. Third, the record bears out that Wiant's suspicions were not confirmed (i.e. articulable facts were not present) until after his conversation with Warner. For these reasons, the court finds that the incriminating nature of the cash was not immediately apparent although Howard was unemployed and previously convicted of selling drugs.

idence seized during an unlawful search [cannot] constitute proof against the victim of the search." *Wong Sun*, 371 U.S. at 484, 83 S.Ct. 407. This so-called exclusionary rule requires the suppression of evidence that is the " 'fruit[ ] of the agents' unlawful action." *Id.* The exclusionary rule applies equally to both physical and verbal evidence. *See id.* at 486, 83 S.Ct. 407 ("[T]he policies underlying the exclusionary rule [do not] invite any logical distinction between physical and verbal evidence.").

The Third Circuit has restated the *Wong Sun* standard as two separate inquiries. The court must consider: "(a) the proximity of an initial illegal custodial act to the [acquired evidence]; and (b) the intervention of other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest." *See United States v. Burton*, 288 F.3d 91, 99, 100 (3d Cir.2002) (citations omitted). The Third Circuit explained, "The first inquiry assesses the measure of attenuation between illegal police conduct and the evidence allegedly exploited from it ... The second inquiry concerns whether an independent source exists for that evidence." *See id.*[12] Evidence that meets both of these criteria is within the scope of *Wong Sun* and may be suppressed.

■ First, the court finds that there is no attenuation between the illegal custodial act and the acquisition of the physical evidence. As previously noted, the sequence of events culminating in the discovery of the weapon was as follows: Wiant felt the lump in Howard's pocket during his pat-down. He then seized the lump, discovered it was money, and counted it.

Howard and Warner were asked how Howard had obtained the money. Based on the inconsistencies between their stories, Wiant asked Rowe for permission to search the vehicle. The search lead to the discovery of the handgun. This series of events was uninterrupted and occurred in rapid succession. This causes the court to conclude that the initial seizure and the subsequent discovery of the gun were closely connected. Given the fact that the discovery of the gun was directly preceded by and was directly dependent upon the seizure of the money, the court finds that the "link" in the "chain" between the illegal seizure and the search of the vehicle was not broken.

The court now considers whether other circumstances intervened between the initial seizure and the search that might dissipate the taint of the illegal search. The record demonstrates that no other events intervened between the initial seizure of the money and the discovery of the physical evidence. *See id.* In fact, the only events that occurred between the seizure of the money and the search of the vehicle were the questioning of Howard and Warner and Wiant's request of his supervisor for permission to search the vehicle. Rather than dissipating the taint, these events occurred as a direct result of the tainted seizure. Therefore, the court concludes that there were no intervening circumstances between the seizure and the discovery of the physical evidence.

■ The court reaches a similar conclusion with regard to the testimonial evidence. There was no significant attenuation between the seizure and the incriminating statements. Admittedly, no witness testified to the exact time frame of the search. However, Wiant testified

---

12. Although the court will briefly discuss the independent source considerations in this section of the memorandum, a more complete discussion will follow in subsection 2, *infra*.

that it was approximately 5:30 p.m. when he stopped Howard. Ogden testified that when he arrived, it was still "early evening," which the court has already construed to mean sometime shortly after 5:30. Even if the court were to assume that it took Ogden a few hours to arrive at the scene, courts have suppressed evidence where the time interval was much greater than a few hours. *See id.* (suppressing evidence where "statement was separated from arrest by less than two hours"); *United States v. Butts,* 704 F.2d 701, 705 (3d Cir.1983) (suppressing confession made "fewer than four hours after" arrest); *United States v. Marc,* No. 96–76, 1997 WL 129324, at *8 (D.Del. Mar.18, 1997) (suppressing statement made ten hours after arrest). Thus, the court finds that the passage of time between the seizure and the confession was too insignificant to dissipate the earlier taint.

 The record does indicate that Howard was given *Miranda* warnings prior to making certain statements. Additionally, the record does not reveal that Howard's statements were made in response to questions made by the officers. Howard's inculpatory statements could therefore be characterized as voluntary, and could be considered "intervening independent act[s] of free will." *See Wong Sun,* 371 U.S. at 486, 83 S.Ct. 407. However, "[w]here a Fourth Amendment violation 'taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted into evidence." *See Oregon v. Elstad,* 470 U.S. 298, 306, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (citations omitted). *See also Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In *Brown v. Illinois,* the Su-

preme Court further clarified this analysis by stating,

> The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by the exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Id.* at 603–04, 95 S.Ct. 2254 (citations omitted). The court also noted that burden of proving the existence of these factors rests with the prosecution. *Id.* at 604, 95 S.Ct. 2254.

In the present case, although Howard received *Miranda* warnings, the prosecution has not met the burden of proving that the *Brown* factors (temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct) lead to a conclusion that the confession was significantly removed from the illegal seizure. First, as previously discussed, the temporal proximity of the seizure and the confession was minimal. Second, the prosecution has not shown that some intervening event occurred that would dissipate the initial taint. Indeed, the only intervening event that occurred between the discovery of the handgun and the confession is the arrival of Officer Ogden. Ogden's presence was arguably the product of the initial illegality because if it were not for the illegal seizure, the police would not have been called. Not only was the arrival of the officer not an independent act, but his arrival, without more, is insufficient to dissipate the taint. Finally, the court acknowledges that it would probably be incorrect to characterize the officers' violation of Howard's

rights as "flagrant." Nevertheless, the totality of the circumstances establishes that the initial violation was integrally related to the eventual incriminating statements. *See Marc*, 1997 WL 129324, at *8 (finding that although the constitutional violation was not flagrant, the totality of the circumstances nevertheless required suppression). These circumstances compel the conclusion that Howard's statements were directly connected to the prior constitutional violation, and were not sufficiently voluntary to pass constitutional muster.

For all of the foregoing reasons, the court concludes that both the physical evidence and the inculpatory statements are the fruit of the poisonous tree as defined in *Wong Sun* and clarified by the Third Circuit.

### 2. No exception to the exclusionary rule can render the evidence admissible

■ Although the court finds that the handgun and the confession are the products of the illegal seizure, the inquiry does not end there. The exclusionary rule requires that before the court can order the suppression of evidence, it must determine "whether the derived evidence came directly as a result of the exploitation of the constitutional violation or whether the derived evidence was obtained 'by means sufficiently distinguishable as to be

purged of the primary taint.'" *See United States v. Pelullo*, 173 F.3d 131, 136 (3d Cir.1999) (quoting *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407). To that end, "[c]ourts have developed a number of exceptions to the exclusionary rule, including the independent source, inevitable discovery, and attenuation doctrines, and a good faith exception." *See id.* The court will now consider the independent source and inevitable discovery doctrines.[13]

#### a. The independent source doctrine[14]

■ Under the independent source doctrine, "evidence that was *in fact* discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible." *See United States v. Herrold*, 962 F.2d 1131, 1140 (3d Cir.1992) (emphasis in original). The independent source doctrine may be applicable where, for instance, officers enter a residence illegally and seize a firearm, but they possess a search warrant authorizing them to seize firearms that would have permitted them to legally seize the items in the absence of the unlawful entry. *See id.* at 1143.

In the present case, there is no evidence that, despite the illegal seizure, the officers had another independent legal basis for the search of the vehicle. Unlike *Herrold*, there was no warrant that would have allowed Wiant and Rowe to conduct the search. Therefore, the search can only be

---

**13.** The court will not discuss either the attenuation or good faith doctrines. Whether the evidence was attenuated from the initial seizure has been discussed in relation to the *Wong Sun* analysis. *See* Part IV.C.1., *supra.* The court will not rehash those conclusions.

"The good faith exception instructs that suppression of evidence is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority, even though no probable cause to search exists." *United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir.2002). The good

faith exception is therefore applicable only to searches involving warrants. Since the suppression motion here concerns a warrantless search, the court will not consider the good faith exception.

**14.** The independent source and inevitable discovery doctrines are closely linked. *See Herrold*, 962 F.2d at 1139 n. 8. The court therefore incorporates by reference its discussion of the inevitable discovery doctrine, Part IV. C.2.b. *infra,* into this section.

justified if one of the exceptions ·to the warrant requirement would have permit-ted the search. In the present case, the only warrant exceptions that might justify the search are an area search pursuant to *Terry*, the automobile exception, and the search incident to arrest exception.[15] The court will consider each of these exceptions in turn.

The *Terry* doctrine permits offi-·cers to conduct a protective search of the area within the arrestee's control. *See Michigan v. Long*, 463 U.S. 1032, 1052, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). How-ever, "[t]o engage in an area search, which is limited to seeking weapons, the officer must have an articulable suspicion that the suspect is potentially dangerous." *See id.* at 1052 n. 16, 103 S.Ct. 3469.

The search of Howard's vehicle cannot be considered an area search pur-suant to *Terry*. When the court ques-tioned Wiant about what he was looking for during the search, he stated that when he searched the vehicle, he was not search-ing for weapons. Rather, Wiant clearly testified that he was only searching for contraband. While contraband is a per-missible subject of other searches, *Long* clearly states that in order to qualify as a *Terry* area search, the search must be "limited to seeking weapons." Since this search was not limited to the discovery of weapons, it cannot be considered valid un-der *Terry*. Therefore, it may not serve as an independent source for the· evidence.

The court· next considers whether this search could be validated under the automobile exception to the warrant re-quirement. The automobile exception per-mits officers to search a vehicle without a warrant. where ·probable cause. exists to search the vehicle. *See Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485,, 135 L.Ed.2d 1031 (1996). Because How-ard was a probationer, however, the Gov-ernment need only demonstrate that there was reasonable suspicion to believe that the car contained contraband. *See Baker*, 221 F.3d at 443.

The court finds that the Government has not demonstrated that there was reason-able suspicion to search the vehicle in the absence of the information gleaned from the illegal seizure. Prior to the seizure, all Wiant knew, or reasonably suspected, was that Howard was planning to drive the vehicle. Nevertheless, the fact that How-ard was· carrying car keys does not logical-ly or reasonably lead to the conclusion that he was also carrying a gun or drugs. In fact, reasonable suspicion to believe that contraband was in the car did not arise, if at all, until after Wiant seized the money and discovered that Howard and Warner's explanations for the money were inconsis-tent.[16] Therefore, even if Wiant's suspi-

---

15. The only exceptions advanced by the Gov-ernment are the search incident to arrest and automobile exceptions. Although the court recognizes that there are other exceptions to the warrant requirement (i.e. the plain view, exigent circumstances, and consent excep-tions), the court notes that each of these ex-ceptions is inapplicable to these facts.

16. The court notes that the Government ar-gues that there was probable cause to believe that Howard was again dealing drugs based on his prior conviction for drug dealing. The court finds that without the information that

resulted from the illegal seizure, the fact of the prior conviction cannot establish probable cause, even when considered in conjunction with the probation violation. *See Baker*, 221 F.3d at 445 ("[N]either Baker's violation of his parole by driving a vehicle nor his failure to document that he owned the vehicle can give rise to a reasonable suspicion that he was committing other, unspecified [crimes]."). Moreover, the court notes that although Cody McIntyre allegedly provided information to Wiant, the record does not indicate what in-formation McIntyre provided or the extent of that information. Even if the court were to

cions were reasonable at that point, they were integrally connected with the illegal seizure. Thus, the automobile exception cannot serve as an independent basis for the search.

■ Finally, the court considers whether the search might be justified as a warrantless search incident to a valid arrest. The Supreme Court has long held that "it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Unlike a *Terry* area search, the officer need not have further reasonable suspicion or probable cause to conduct a search incident to a valid arrest. *See United States v. Robinson*, 414 U.S. 218, 234–35, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

■ As previously discussed, the court finds that the record clearly demonstrates that Howard was about to drive the vehicle. Therefore, there was probable cause to arrest Howard for violating his probation or for a traffic violation. Furthermore, the court finds that Howard was arrested at the time the search occurred. As the Government notes, no clear line separates a *Terry* stop from an arrest. *See United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). However, the Supreme Court has stated that when determining whether a seizure is an arrest or a stop, "we have emphasized the need to consider the law enforce-ment purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *See id.*

During a proper *Terry* stop, an officer may " 'briefly stop [the] person, ask questions, or check identification,' and, if warranted, [ ] conduct a brief pat-down for weapons." *See id.* at 697, 105 S.Ct. 1568 (Marshall, J., concurring). In the present case, all of these actions had been taken prior to the search of the vehicle. Howard had been stopped and frisked. After the frisk, he was questioned. Therefore, the purposes of a *Terry* stop had been fulfilled by the time the car was searched. Indeed, Wiant testified that when he searched the car, he was not searching for weapons, as permitted by *Terry*, but was searching for contraband. For these reasons, the court finds that the initial Terry stop had evolved into an arrest by the time the search was conducted.

Having concluded that Howard was arrested and that there was probable cause for that arrest, the court must determine whether the search of the vehicle was proper incident to that arrest. The court concludes that it was not. Howard asserts that since he was outside of the vehicle, the officers could not legally search the passenger compartment because he was not an occupant of the vehicle as required by *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Conversely, the Government asserts that since Howard was preparing to enter the vehicle, he was able to access the interior compartment, thereby making the search

---

assume that McIntyre told Wiant that Howard was again selling drugs, the court would still not consider that evidence for two reasons. First, the prosecution adduced no evidence from which the court could determine McIntyre's credibility or the reliability of the information he provided. *See Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("We agree ... that an informant's

'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report."). More important, Wiant testified that McIntyre's information did not influence his decision to arrest Howard. Therefore, the court will not use McIntyre's report to determine whether there was reasonable suspicion or probable cause to believe Howard was selling drugs.

lawful. The Government cites several cases in support of the proposition that a search incident to arrest can be conducted while an arrestee is outside of his vehicle. In particular, the Government cites *United States v. Franco*, 981 F.2d 470 (10th Cir. 1992), *United States v. Garcia*, 785 F.2d 214 (8th Cir.1986) and *United States v. Bautista*, 731 F.2d 97 (1st Cir.1984). Although the Government also cites *United States v. Schecter*, 717 F.2d 864 (3d Cir. 1983) it acknowledges that the Third Circuit has not squarely addressed this issue.

The court is not persuaded by the cases cited by the Government for two reasons. First, the cases are factually distinguishable. *Franco* involved a defendant who traveled back and forth between the police car and his own car. *Franco*, 981 F.2d at 472. Howard never entered his own vehicle, much less went back and forth between two vehicles. Similarly, *Garcia* involved a person who was "in or just entering the vehicle." *Garcia*, 785 F.2d at 225. Again, although the record establishes that Howard might have opened the door, it does not establish that Howard was in or entering the vehicle. Finally, *Schecter* provides little guidance because the although the case tells us that Schecter "stumbled about the auto," neither the facts or the rationale of the opinion clearly depict the amount of access Schecter had to the vehicle when he was stopped. *See Schecter*, 717 F.2d at 865, 867–68. Therefore, the only case that approximates the instant facts is *Bautista*. In *Bautista*, it is clear that the defendant was standing beside an open car door. *Bautista*, 731 F.2d at 99.[17]

Second, although the Government provided the court with these (largely distin-

guishable) cases, the Government neglected to point out that currently, there is a split in authority in the circuits as to whether a search incident to arrest may be conducted when a person is outside of a vehicle. Although the First Circuit in *Bautista* held that it was proper, the Sixth Circuit, the Seventh Circuit, and the District of Columbia Circuit have all held that where a person is outside of a vehicle, a search incident to arrest is improper. In *United States v. Adams*, 26 F.3d 702, 706 (7th Cir.1994), the Seventh Circuit stated, "[I]n *Belton* and all the cases on which the government relies, the arrestee—even if he was not an occupant of the car at the moment of arrest—had been an occupant of the searched car immediately prior to the search." *See id.* The court therefore found that since the defendant was not an occupant of the vehicle immediately prior to his arrest, there was no search incident to arrest. *See id.* In *United States v. Strahan*, 984 F.2d 155, 159 (6th Cir.1993), the Sixth Circuit reached a similar conclusion, stating, "*Belton* applies only where the police initiate contact while the defendant is within his automobile, but subsequently remove the arrestee. Indeed, Belton clearly limits its application to only those settings where an officer makes a custodial arrest 'of the *occupant* of an automobile....'" *See id.* (quoting *Belton*, 453 U.S. at 460, 101 S.Ct. 2860). In support of this conclusion, the Sixth Circuit cited *United States v. Fafowora*, 865 F.2d 360, 362 (D.C.Cir.1989), wherein the D.C. Circuit reached a similar conclusion. *See id.* at 362 (focusing on whether the "arrested *occupant*" of the vehicle might reach evidence) (emphasis added).

---

17. Furthermore, *Bautista* is only on point to the extent that the court finds the door was open. As previously noted, although Rowe testified that Howard "opened" the door, no

testimony was elicited as to whether open meant "unlocked" or the door was actually opened.

Given the split in authority and the Third Circuit's silence on this issue, the court concludes that the view held by the Sixth and Seventh Circuits is the better view. In *Chimel*, the Supreme Court stated that the rationale behind the search incident to arrest doctrine is to prevent arrestees from obtaining evidence that might be within "the area from within which he might gain possession of a weapon or destructible evidence." *Chimel*, 395 U.S. at 763, 89 S.Ct. 2034. It is perfectly reasonable to conclude, as have at least three circuits, that an arrestee cannot gain possession of a weapon that is in the passenger compartment if he is outside of the passenger compartment. To conclude otherwise would be to engage in the creation of unjustified legal fiction.

Applying this rule to the facts of the instant case, the court finds that Howard had not yet entered the vehicle. He was, therefore, not an occupant of the vehicle. Perhaps the court would reach a different conclusion if there was *clear* evidence that the door was wide open, giving Howard access to the vehicle's interior, or if there were any evidence to establish that Howard had reached into the vehicle. Similarly, if there was testimony that Howard had entered the vehicle or been inside the vehicle immediately prior to the search, the court's decision might be different. But on these facts, the court is persuaded that under *Belton*, Howard's vehicle could not properly be searched incident to arrest. Therefore, the search incident to arrest doctrine cannot provide an independent source for the search of the vehicle.[18]

For all of the foregoing reasons, the court concludes that the independent source doctrine is inapplicable to this case.[19]

### b. The inevitable discovery doctrine

■ The inevitable discovery doctrine applies where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Herrold*, 962 F.2d at 1139 (quoting *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). The Third Circuit has further stated that "[i]t is the government's burden to show that the evidence at issue would have been acquired through lawful means, a burden that can be met if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence." *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir.1998).

---

18. The court recognizes that although it held that Howard was not an occupant of the vehicle, in its previous discussion of standing, it held that Howard had possession and control of the vehicle. The court notes that there is no tension between these findings. There is a difference between having possession and control over an automobile and, therefore, standing to contest a search, and being an occupant of that same automobile at the time of a search or immediately preceding that search.

19. The court's conclusion regarding the applicability of the independent source doctrine to the physical evidence holds true for the testimonial evidence as well. If the money had not been found, the car would not have been searched. If the vehicle had not been searched, the bullet and the handgun would not have been found. If the handgun had not been found, Howard would not have made inculpatory statements regarding it. Given the fact that the discovery of the money was the catalyst in the chain of events that culminated in the incriminating statements, the court finds that the statements are the proximate result of the initial illegal seizure. Since there is no independent source for the search, it follows that there can be no independent source for the testimonial evidence that was obtained as a result of that search.

It is abundantly clear that without the illegal seizure, the discovery of the gun was not inevitable. As previously noted, the local probation regulations required Wiant to ask permission before searching the vehicle. The record establishes that Wiant only requested this permission after he had seized the money and discussed its origins with both Howard and Warner. Wiant testified that it was only after he discovered that Howard and Warner's stories were inconsistent that he requested permission to search the vehicle. Tr. at 28. He stated, "[T]he reasons he [Howard] had the money weren't consistent with what she [Warner] told me and because he was unemployed for quite a long time and a known drug dealer convicted of drug dealing that [sic] I felt that was enough to prompt a search of the vehicle." Rowe also testified that "based on what we [had] seen so far," i.e. the inconsistent explanations regarding the money, he believed a search of the vehicle was warranted. The decision to search the vehicle was thus dependent upon the information obtained as a result of the illegal seizure. It is, therefore, difficult for the court to conclude that the car inevitably would have been searched if the illegal seizure had not occurred. Similarly, without the discovery of the gun, it seems highly unlikely that Howard would have confessed to the ownership or possession of a gun. *See id.* at 196 (applying inevitable discovery doctrine to testimonial evidence).

Furthermore, there is no support for the conclusion that the officers would have inevitably searched the car because they were required to do so by the applicable probation office regulations. At the suppression hearing, the Government did not adduce any evidence demonstrating that the probation office procedures or regulations dictated that a search of a vehicle must be conducted every time a probation is stopped or arrested. While it would not be unreasonable to surmise that such a regulation exists, the Government must prove the existence of the regulation by a preponderance of the evidence—the court cannot speculate on this point. Since the Government has provided no evidence on the probation office procedures on this issue, it has failed to meet its burden of proving that those regulations made the search of the vehicle inevitable.[20]

For all of the foregoing reasons, the court concludes that the inevitable discovery doctrine is inapplicable in this case.

## IV. CONCLUSION

The court concludes that Howard has standing to contest this search. The court further concludes that there was reasonable suspicion to stop Howard as he approached the car. Nevertheless, the court finds that the subsequent frisk of Howard exceeded the permissible bounds of a *Terry* frisk and thereby violated Howard's Fourth Amendment right to be free from unreasonable searches and seizures. The court also finds that the physical evidence and statements were the direct products of that seizure and are, therefore, the "fruits of a poisonous tree." Finally, the court concludes that there is no exception to the exclusionary rule that will overcome the constitutional violation and render the evidence admissible. For all of these reasons, the court concludes that the physical

---

**20.** Similarly, the court finds that the Government also failed to adduced evidence establishing the existence of any Probation and Parole or City of Wilmington regulations that would have required Wiant, Rowe, Ogden, or another officer to conduct an inventory search of Howard's vehicle after his arrest. Therefore, the court finds that an inventory search of Howard's car was not inevitable. Thus the search of the car cannot be justified on this basis.

evidence and statements must be suppressed.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. The Defendant's motion to suppress (D.I.15) is GRANTED.