J. S42039/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| JONATHAN P. NAYLOR III, | : | |
| | : | |
| Appellant | : | No. 2499 EDA 2014 |

Appeal from the Judgment of Sentence July 28, 2014
In the Court of Common Pleas of Chester County
Criminal Division No(s).: CP-15-CR-0004372-2010

BEFORE: SHOGAN, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.: **FILED SEPTEMBER 11, 2015**

Appellant, Jonathan P. Naylor, III, appeals from the judgment of sentence entered in the Chester County Court of Common Pleas following a stipulated fact trial. Appellant was found guilty of rape of a child,[1] involuntary deviate sexual intercourse with a child,[2] corruption of minors,[3] and indecent assault of a child less than 13.[4] Appellant contends the court

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 3121(c).

[2] 18 Pa.C.S. § 3123(b).

[3] 18 Pa.C.S. § 6301(a)(1).

[4] 18 Pa.C.S. § 3126(a)(7).

erred in finding that the H.S.'s testimony was admissible at trial and not excluded as "fruit of the poisonous tree." We affirm.

On May 18, 2011, Appellant pleaded guilty and was sentenced to an agreed upon sentence. On February 15, 2013, Appellant filed a Post Conviction Relief Act[5] ("PCRA") Petition requesting to withdraw his guilty plea. On May 23, 2013, the petition was granted. On September 19, 2013, Appellant filed an Omnibus Pretrial Motion seeking, *inter alia*, to suppress certain physical evidence, including his digital camera, obtained as a result of the search of his backpack at the time of his arrest on an outstanding warrant "and any derivative evidence obtained as a result of the illegal search." Omnibus Pretrial Mot., 9/19/13, at 2 (unpagniated). On September 30, 2013, a hearing was held on the motion to suppress.[6]

At the hearing on Appellant's motion to suppress, the following transpired:

---

[5] 42 Pa.C.S. §§ 9541-9546.

[6] The certified record did not include the September 30, 2013 suppression hearing transcript, which we deemed necessary for our review of Appellant's issue on appeal. Upon informal inquiry by this Court, the trial court informed us that the notes of testimony were not transcribed. We directed Appellant to order the notes of testimony from the suppression hearing. Order, 7/1/15. We remind Appellant's counsel, "Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty." **See Commonwealth v. B.D.G.**, 959 A.2d 362, 372 (Pa. Super. 2008) (*en banc*) (citations omitted).

Detective Trish Logic testified that she is responsible for handling all child abuse investigations. N.T., 9/30/13, at 7. She received "a call of alleged child abuse." *Id.* at 10. The alleged victim was H.S. and the reported suspect was Appellant. *Id.* H.S. was living with an aunt in Delaware County, having lost both of her parents. *Id.* at 11. She spoke with W.S., H.S.'s paternal grandmother. W.S. told her that H.S.'s father had argued with Appellant about what he "considered to be an inappropriate relationship between [Appellant] and his daughter [H.S.], prior to him dying obviously." *Id.* at 14. A few days later, on September 8, 2010, she went with Detective Sergeant Patrick Mitchell to H.S.'s aunt's house to talk with H.S. *Id.* H.S. did not want to talk to the police. *Id.* at 15.

Detective Logic stated that

> [H.S.] said they were close and that she confided in him and that she saw him as—these are not her words, but mine: Sort of a kindred spirit. They both lost their parents at a young age, and he was the only tie she had to her dead parents.

*Id.* at 15. Detective Logic said that they were going to speak with the person who came forward initially. *Id.* at 15-16. Although H.S. did not say anything happened, Detective Logic was still "actively investigating a suspected child abuse relationship between [Appellant] and [H.S.]." *Id.* at 16. She explained:

> Because in my training and experience, I know that children that are abused sexually by someone they care about, they're reluctant to talk about it and admit anything happened because they will get in trouble. The child

- 3 -

themselves will be in trouble, that is in their mind or that is what the abuser put in their mind. Often children care about that person. They don't want this person to get in trouble. Some children are afraid to talk to the police. There are all different reasons that children will say that nothing happened the first time that they're interviewed.

[The Commonwealth:] So up to that point, you would still have been considered to have been actively investigating a suspected child abuse relationship between [Appellant] and [H.S.]?

A: Yes.

Q: And at this point, how old was [H.S.]?

A: 12.

Q: Prior to you taking any further steps, did you become aware of the Delaware County investigation to [sic] [Appellant]?

A: Shortly after we started our investigation, several weeks into it, we did receive notice from the Delaware, from Media Borough Police that they encountered [Appellant] along with another adult male, two juvenile females, one of which was [H.S.].

Q: After Delaware County became involved, did you, on October 4th, 2010 interview [H.S.] again?

A: Yes.

Q: And at this point, was she able to disclose details of various actions between her and [Appellant]?

A: Yes, she was.

Q: On October 7th, 2010, did your department receive more information from another source in the child abuse investigation?

A: Yes.

Q: Who did that information come from?

A: A gentleman by the name of Randell Snyder, a resident of the trailer park of [Appellant] and [H.S.].

Q: Did his interview have an impact on your child abuse investigation?

A: Yes.

\* \* \*

Q: Detective, after Mr. Snyder came in, was your department able to take a full interview from Mr. Snyder?

A: Yes, another detective, not me, took an interview of Mr. Snyder.

Q: Was Mr. Snyder's information significant to your investigation?

A: Yes. It was not part of my criminal—I already had spoken to [H.S.] by the time he came in, but it did corroborate the initial report that was made.

\* \* \*

Q: Detective Logic, on November 30th, 2010 was there a preliminary hearing in this case?

A: Yes.

Q: Based on sex abuse charges against [Appellant] where [H.S.] was the victim?

A: Yes.

Q: And did [H.S.] testify under oath at that district court hearing?

A: Yes.

\* \* \*

Q: Detective, on December 16th, 2010, did you meet with public defender Peter Jurs to discuss an inmate David Price?

A: Yes.

Q: Did you arrange for a proffer?

A: Yes.

Q: Did David Price report incriminating statements made by [Appellant] to you that day?

A: Yes.

*Id.* at 16-19, 20, 22-23.

Edward Fullmer, patrolman with the Media Borough Police Department, testified.

[The Commonwealth:] Officer, were you on duty back on September 11th, 2010?

A: I was.

Q: Were you on patrol with anyone else from your unit?

A: Yes. Officer Eric Gavin and I were both on patrol.

Q: That would have been patrol in the Borough of Media?

A: Yes, in a uniform, on patrol, with marked patrol cars in Media.

*      *      *

Q: That day, did you observe [Appellant] in Media?

A: Yes . . . . I did observe him and another white male by the name of Marcus Jackson, I believe, and two juvenile females . . . .

*      *      *

Q: What do you recall from your observations?

A: As I was driving by, I happened to notice that one of the juvenile females was sitting up on a tool box in the back of the pick-up truck. [Appellant] was standing outside the truck near the driver's door. There was another juvenile female standing on the ground and the other white male was talking to her and it just seemed out of place to me because of their ages. Both the white males appeared to be in the mid to late 20's and both juveniles appeared to be very young, 13 or below. It caught my attention, but I also saw the female seated in back and I had concerns for her safety. . . .

\* \* \*

Q: So when you went up to [Appellant] and expressed your concern about someone riding in the back of this truck, what was his reaction?

A: He identified himself as the operator of the vehicle. He said he would not pull away with her in there and she would be safe.

Q: What were the reactions of the two young juvenile females?

A: When I approached in the police car, they were very, very nervous. They would not make eye contact, which raised my suspicion level again that something was wrong, and when I did pull away after talking to [Appellant], I observed the young juvenile jump out of the back of the truck and both of them almost ran all the way up to State Street.

\* \* \*

Q: What happened next?

A: I drove down the street, down around, came back again. For some reason I was suspicious of the entire scene. So I pulled back up the street. . . . I was actually coming up the street, made eye contact and [Appellant] decided to get out of the driver's side and go into the

passenger side and Marcus Jackson decided to take over the driver's side. I pulled up next to him because when I talked to them at close distance, it appeared they might be high or intoxicated. . . . At that time, I initiated a car stop and called my partner Officer Gavin.

Q: As part of the process, did you run [Appellant's] name through law enforcement database?

A: Yes, both him and Mr. Jackson. . . . I found a warrant for [Appellant] for drugs. . . .

Q: Did you arrest [Appellant] that day?

A: We took him and Mr. Jackson into custody . . . .

*  *  *

Q: Was there a backpack in [Appellant's] vehicle that day?

A: Yes. It was actually on the passenger side of the vehicle. Once I took them into custody, we did a search. . . .

*  *  *

Officer Gavin and I did not even know who it belonged to, went through the backpack and were looking for evidence as to who owned it. We found a bunch of syringe boxes, with drugs in it. We found the camera . . . . Then I saw a lot of pictures . . . .

*Id.* at 29-34.

Detective Sergeant Jack Kelly of the District Attorney's Office of Delaware County testified. *Id.* at 40. On September 24, 2010, he went to H.S.'s aunt's house to speak with H.S. regarding the pictures. *Id.* at 44, 45. The photographs on the camera were not actually shown to H.S. *Id.* at 46. She became very upset and she agreed to come speak with the detective at another time. *Id.* On September 27, 2010, Detective Kelly conducted a full

interview with H.S. and obtained a written statement written by her. *Id.* at 47.

H.S. testified at the hearing. She was asked by the Commonwealth about the initial meeting at her aunt's house with Detective Logic and one of the Detective's colleagues.

> [The Commonwealth:] Did they ask you whether or not there was anything inappropriate or sexual going on between you and [Appellant]?
>
> A: Yes.
>
> Q: At that point, did you tell them no?
>
> A: Yes.
>
> Q: Why?
>
> A: Well, I was pretty nervous that the police were in my house.
>
> Q: How old were you then?
>
> A: I was 12.
>
> Q: You said you were nervous about the police being at your house?
>
> A: Yes.
>
> Q: Back then, in September 2010, did you care for [Appellant]?
>
> A: Yes.
>
> Q: Had he been a friend of your parents?
>
> A: Yes.
>
> Q: Did you believe that he cared for you?

A: Yes.

\*     \*     \*

Q: . . . [A]fter that visit . . . officers came to see you.

A: Yes.

Q: Did they ask you the same thing as to whether or not there was anything inappropriate going on between you and [Appellant]?

A: Yes.

Q: At some point, what did you tell them?

A: At first I said: No.

Q: Did you want to talk to them?

A: No.

Q: Why?

A: I was scared.  My aunt was mad at me.

Q: Did they tell you about photographs?

A: Yes.

Q: Why were you scared about your aunt being mad at you?

A: Well, at first, I would not come forward to talk to the police.

Q: Your aunt was upset with you about that?

A: A little.

Q: You said that the police did tell you about photographs?

A: Yes.

Q: Do you recall one way or the other whether they showed you the photographs?

A: I don't think they did.

Q: But you knew what they were talking about when they mentioned it. Did you tell them what was going on between you and [Appellant] during that conversation at your home?

A: Yes.

Q: Did you agree to come into the Delaware County detectives office a couple days later and speak to them further?

A: Yes.

Q: Did you then agree to come into the Chester County District Attorney's office and speak with Detective Logic about what was going on?

A: Yes.

Q: On November 30, 2010, do you recall testifying under oath as to your relationship between you and [Appellant]?

A: Yes.

* * *

Q: Are you willing to testify against [Appellant] as to what happened when you were 12 between you and him?

A: Yes.

*Id.* at 51-52, 53-55. Following the hearing, in an oral ruling from the bench, the court found that H.S.'s testimony "would be admissible and not

suppressible as fruit of the poisonous tree." *Id.* at 60. The court suppressed the photographs from the camera in the backpack.[7] *Id.* at 61.

On October 10, 2013, Appellant filed a motion for reconsideration. On January 28, 2014, the court denied the motion to preclude the testimony of HS. Order, 1/28/14. Following his conviction on stipulated facts, Appellant was sentenced to ten to twenty years' incarceration, plus five years' consecutive probation. This timely appeal followed. Appellant filed a timely court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal and the trial court filed a Pa.R.A.P. 1925(a) statement incorporating its January 28, 2014 order and opinion.

Appellant raises the following issue for our review: "Did the [c]ourt err in finding that H.S.'s testimony was admissible at trial and not excluded as 'fruit of the poisonous tree?'" Appellant's Brief at 9. Appellant contends the inevitable discovery rule does not prevent the exclusion of H.S.'s statement because "[t]he Commonwealth has demonstrated no independent source for this discovery." *Id.* at 16. Appellant argues that the "[e]vidence of the sexual relationship between [him] and H.S. was obtained as a direct result of the illegal search and seizure of the digital camera and its contents." *Id.* at 17.

Our review is governed by the following principles:

---

[7] The court also suppressed a letter that was taken from the backpack. *Id.* at 61.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Where the prosecution prevailed in the suppression court, we may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*In re J.E.*, 937 A.2d 421, 425 (Pa. 2007) (citations omitted).[8]

In *Commonwealth v. Williams*, 2 A.3d 611 (Pa. Super. 2010) (*en banc*), this Court explained

> the "inevitable discovery rule" and the "independent source rule" actually are distinct doctrines. The Third Circuit in *United States v. Herrold*, 962 F.2d 1131, 1140 (3rd Cir. 1992) (emphases in original), observed that the two concepts are often conflated, and the Court cogently analyzed the difference between them:
>
>> [U]nder the independent source doctrine, evidence that was **in fact** discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible. In contrast, the inevitable discovery doctrine . . . permits the introduction of evidence that **inevitably would have** been discovered through lawful means, although the search that actually led to the discovery of the evidence was unlawful. The independent source and inevitable discovery doctrines thus differ in that the former focuses on what actually happened and the latter

---

[8] We note that the rule announced in *In re L.J.*, 79 A.3d 1073 (Pa. 2013) does not apply in the case *sub judice* because litigation was commenced prior to October 30, 2013. *See id.* at 1089 n.19.

> considers what would have happened in the absence
> of the initial search.
>
> . . . The independent source rule derives from the very
> nature of the exclusionary rule; thus, we start at the
> beginning. The exclusionary rule provides that evidence
> obtained due to an unconstitutional search or seizure
> cannot be used against a defendant. The exclusionary rule
> also applies to any evidence discovered as a result of the
> original illegal police conduct; such evidence is termed
> "fruit of the poisonous tree."

*Id.* at 618-19 (some citations omitted).

In ***Commonwealth v. Roberts***, 681 A.2d 1274 (Pa. 1996), the

Pennsylvania Supreme Court addressed the issue of whether "counsel was

ineffective for failing to file a motion to suppress the victim's identification of

[the defendant] as the fruit of an illegal arrest." ***Id.*** at 1275. The ***Roberts***

Court opined:

> [W]e find that the victim's identification of [the defendant]
> is legally admissible because it was not the direct result of
> [his] arrest. In ***Commonwealth v. Garvin***, [ ] 293 A.2d
> 33 ([Pa.] 1972), this Court was confronted with the issue
> of whether the appellant's arrest was illegal and, if so,
> whether the subsequent identification was tainted by the
> illegality. Although it was determined that the appellant's
> arrest was illegal, this Court nevertheless upheld the
> admissibility of an in-court identification as well as an out-
> of-court identification that occurred immediately after the
> appellant was arrested. In so holding, we observed that
> "[n]o law abiding society could tolerate a presumption that
> but for the illegal arrest the suspect would never have
> been required to face his accusors [sic]. Thus, . . . the
> only effect of the illegal arrest was to hasten the inevitable
> confrontation and not to influence its outcome." ***Id.*** at [ ]
> 37.
>
> Assuming arguendo that [the officer's] arrest of [the
> defendant] was illegal in the instant case, the identification

evidence is nonetheless admissible. The record reveals that an adequate and independent basis existed to support the victim's identification of [the defendant]. . . .

Based on the foregoing, it is apparent that **the illegality of the arrest, if any, did not contribute to the knowledge of the witness nor to the accuracy of his identification**. As such, we must conclude that counsel was not ineffective for failing to file a motion to suppress the identification of [the defendant].

*Id.* at 1276-77 (emphasis added).

Instantly, the trial court opined:

**This is not a case where H.S. came to the attention of the police because of the photographs**. She was already a focus of their attention, as was her relationship with [Appellant]. The mere fact that they were reported as being together within 11 days of Detective Logic's initial contact would have warranted further contact between the Detective and H.S.

*   *   *

H.S. testified freely both at [Appellant's] preliminary hearing and before me. . . . There was no evidence that H.S. was testifying because of the existence of the photos as opposed to doing so of her own free will.

Trial Ct. Op., 1/28/14, at 5, 6 (emphasis added). We agree no relief is due.

In the case *sub judice*, Detective Logic had received a call regarding alleged child abuse involving Appellant and H.S.. Her department received information from another source, Randell Snyder, in reference to the child abuse investigation. David Price reported that Appellant made incriminating statements to him while in prison. The investigation of inappropriate contact between H.S. and Appellant was not discovered as a result of illegal police

conduct. Therefore, it was not the fruit of the poisonous tree. ***See Williams***, 2 A.3d at 618-19. The illegality of the seizure of the photographs did not contribute to H.S.'s knowledge of what transpired between her and Appellant. ***See Roberts***, 681 A.2d at 1276-77. We discern no abuse of discretion in the trial court's denial of the motion to preclude the testimony of H.S. based upon its finding that H.S. was testifying of her own free will, not because of the existence of the photographs. ***See In re J.E.***, 937 A.2d at 425.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/11/2015